"O"

1  WINSTON & STRAWN LLP
   Gail J. Standish (SBN: 166334)
2  e-mail: gstandish@winston.com
   Peter E. Perkowski (SBN 199491)
3  e-mail: pperkowski@winston.com
   333 South Grand Avenue, 38th Floor
4  Los Angeles, California 90071-1543
   Telephone:  (213) 615-1700
5  Facsimile:   (213) 615-1750

6  ROTHWELL, FIGG, ERNST & MANBECK, P.C.
   Steven Lieberman (admitted *pro hac vice*)
7  Minaksi Bhatt (SBN: 151312)
   Lisa N. Phillips (admitted *pro hac vice*)
8  1425 K Street, N.W.
   Washington, D.C. 20005
9  Telephone: 202-783-6040
   Facsimile: 202-783-6031

10
11 Attorneys For Intervenor Defendant
   SPEAR PHARMACEUTICALS, INC.

12              UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14               SOUTHERN DIVISION – SANTA ANA

15
16 VALEANT PHARMACEUTICALS        )  Case No. SACV08-449 AG (AGRx)
   INTERNATIONAL,                 )
                                  )  The Honorable Andrew J. Guilford
17          Plaintiff,            )
                                  )  ~~PROPOSED~~ FINDINGS OF FACT
18     v.                         )  AND CONCLUSIONS OF LAW
                                  )  ~~SUBMITTED BY DEFENDANT~~
19 MICHAEL O. LEAVITT, et al.,    )  ~~SPEAR PHARMACEUTICALS,~~
                                  )  ~~INC.~~
20          Defendants.           )
                                  )
21 and                            )
                                  )
22 SPEAR PHARMACEUTICALS, INC.    )
                                  )
23          Intervenor Defendant. )

24
25
26
27
28

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 1 8 2008

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

*Any finding of fact which may be deemed a conclusion of law is incorporated into the "Conclusions of Law" section, and any conclusion of law which may be deemed a finding of fact is incorporated into the "Findings of Fact" section.*

~~These proposed findings of fact and conclusions of law are submitted by Defendant Spear Pharmaceuticals, Inc. ("Spear") pursuant to this Court's June 10, 2008 Order.~~

## FINDINGS OF FACT

I. **BACKGROUND REGARDING THE POTENTIAL CONFLICT OF INTERESTED ISSUE**

1.      This is an action under the Administrative Procedures Act ("APA"). Complaint ¶1. Valeant Pharmaceuticals International ("Valeant") seeks a preliminary injunction ordering the United States Food and Drug Administration ("FDA") to suspend the approval of the Abbreviated New Drug Application ("ANDA") of Spear for 5-fluorouracil cream. Complaint ¶B. Valeant alleges that FDA's approval was arbitrary and capricious because the approval was based on bioequivalence studies in actinic keratosis ("AK"), and did not include bioequivalence studies in superficial basal cell carcinoma ("sBCC"). Complaint ¶¶11-35.

2.      Valeant sells a product called Efudex® cream that includes the active ingredient 5-fluorouracil. Complaint ¶1. The Court granted Spear's motion to intervene as a defendant in this action. Both Spear and the FDA oppose Valeant's motion for a preliminary injunction.

3.      During the pendency of this action, the FDA requested, and the Court granted, a stay in order to assess a potential conflict of interest that it discovered during its assembly of the administrative record in order to avoid even the appearance of any impropriety. The FDA subsequently requested, and the Court granted, an administrative stay pursuant to 21 C.F.R. §§10.33 and 10.35 in order to complete its review of the conflict issue and also to reconsider Spear's approval in view of a scientific issue.

~~4.      Shortly after the FDA became aware of the potential conflict issue, the Office of the General Counsel for the Department of Health and Human Services, Food and Drug Division referred the potential conflict of interest issue to FDA's~~

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1  Office of Internal Affairs, Office of Criminal Investigations.  Declaration of Thomas

2  P. Doyle ("Doyle Dec.") ¶1.

3        5.    The Office of Internal Affairs assigned the matter to the Office of

4  Investigations for the Department of Health and Human Services, Office of the

5  Inspector General.  Doyle Dec. ¶3.

6        6.    The Office of the Inspector General conducted an investigation and

7  determined that there was no conflict of interest.  Declaration of Scott A. Vantrease

8  ("Vantrease Dec.") ¶¶4-5.

9        7.    Mr. Vantrease concluded that:

10       the referral did not provide sufficient information to support that Dr.

11       Wilkin knew that his letter would be presented to the agency, as

12       required by 18 U.S.C. §207(a)(1).  In addition (and even if he did

13       know that the letter would be presented to FDA), I concluded that the

14       information showed that Dr. Wilkin was two supervisory levels above

15       the Medical Officer conducting the review, and that there was nothing

16       else indicating that he was personally and substantially involved in the

17       matter at hand, as required for the permanent restriction relating to

18       former employees under 18 U.S.C. §207(a)(1)(B).   The one-year

19       restriction in 18 U.S.C. §207(c) on communicating to the government

20       would not apply to Dr. Wilkin (regardless of whether he qualified as a

21       senior personnel) because he left HHS in 2005, and his expert opinion

22       was written on March 14, 2007.

23  Vantrease Dec. ¶4.

24       8.    Mr. Vantrease determined "that no further investigation of this matter

25  was warranted."  Vantrease Dec. ¶5.

26       9.    Mr. Doyle notified the Office of the General Counsel "that neither

27  HHS/OIG nor the Office of Internal Affairs would take any action against Dr.

28  Wilkin."  Doyle Dec. ¶5.

2

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

10. In addition, pursuant to this Court's Order, the FDA undertook reconsideration of the Spear ANDA approval. Pursuant to that reconsideration, the FDA reaffirmed the approval of the Spear ANDA on May 30, 2008. AR1088-1225

11. The reaffirmation of Spear's approval was documented in memoranda by senior FDA officials, including a 12-page memorandum by Dr. Douglas Throckmorton, Deputy Director of the Center for Drug Evaluation AR1081-1225. The Administrative Record does not reflect any involvement by Dr. Throckmorton in the original approval of Spear's ANDA. AR938-1086 (original approval documentation, which contains no reference to or indication of any role played by Dr. Throckmorton). Dr. Throckmorton conducted a scientific review of the record and his memorandum provides a fresh perspective concerning the scientific issues that had been studied by the FDA. Dr. Throckmorton recommended that "the approval of [Spear's] ANDA . . . be affirmed as both scientifically and procedurally correct." AR1091.

## II.    THE HATCH-WAXMAN STATUTE

12. Valeant's motion for a temporary restraining order relates to the statutory provisions of the Federal Food, Drug, and Cosmetic Act (the "FDCA") and the agency regulations that pertain to approvals of new drug applications ("NDAs") and abbreviated new drug applications ("ANDAs"). See 21 U.S.C. §301 et seq. (2005)

13. Under the FDCA, an NDA must contain, among other things, clinical studies demonstrating that the drug is safe and effective. See 21 U.S.C. §355(b)(1).

14. The procedures for obtaining FDA approval of generic drugs are set forth in the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98- 417, 98 Stat. 1585, 21 U.S.C. §355(j) (the "Hatch-Waxman Amendments"). In the Hatch-Waxman Amendments, Congress recognized the strong public interest in stimulating generic competition for brand-name patented drugs immediately upon expiration of relevant patents and created a streamlined procedure for the FDA to approve generic drugs more quickly. "Congress sought to get generic drugs into the

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

3

1    hands of patients at reasonable prices -- fast." In re Barr Labs., Inc., 930 F.2d 72, 76

2    (D.C. Cir.), cert. denied, 502 U.S. 906 (1991).

3        15.    As part of the streamlined generic drug approval process mandated by

4    Congress, ANDAs do not have to include separate clinical data showing safety and

5    efficacy of the drug, but instead may rely on the safety and efficacy data in the

6    corresponding NDA.    In order to obtain the FDA's approval, an ANDA must

7    demonstrate, inter alia, that the generic drug is "bioequivalent" to the corresponding

8    innovator drug. See 21 U.S.C. §355(j)(2)(A)(iv); 21 C.F.R. §§314.127(a)(6)(i),

9    314.94(a)(7).

10       16.    Bioequivalence is established by proving that "the rate and extent of

11   absorption of the drug do not show a significant difference from the rate and extent of

12   absorption of the listed drug," for drugs that are absorbed into the blood stream.  See

13   21 U.S.C. §355(j)(8)(B)(i).  For drugs that are not absorbed into the bloodstream, such

14   as topical ointments (including Efudex®), Congress has expressly given the FDA

15   authority   to   "establish   alternative,   scientifically   valid   methods   to   show

16   bioequivalence." See 21 U.S.C. §355(j)(8)(C).    Under this statutory provision, the

17   FDA has the authority to permit an ANDA applicant to use any methods the FDA

18   deems appropriate for the determination of bioequivalence of non-systemic drugs as

19   long as the "the alternative methods are expected to detect a significant difference

20   between the [generic] drug and the listed drug in safety and therapeutic effect." Id.

21       17.    The provision of the FDCA granting FDA express authority to develop

22   alternative methods of establishing bioequivalence for non-systemic (i.e., locally-

23   acting) drug products was enacted by Congress as part of The Access to Affordable

24   Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement and

25   Modernization Act of 2003 ("MMA").    See 21 U.S.C. §355(j)(8)(C).    This

26   amendment codified the approach set forth in the FDA's regulation regarding the

27   determination of bioequivalence for drugs not intended to be absorbed into the

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

4

1  bloodstream, as well as the nearly two-decades-old practice with respect to these types
2  of drugs.  21 C.F.R. §320.24(b)(6).

3      18.    Prior to commencing clinical testing to support an ANDA submission, a
4  prospective applicant can communicate with the FDA and agree to "the parameters
5  and design . . . of a bioavailability and bioequivalence stud[y] of a drug." 21 U.S.C.
6  §355(j)(3)(C).

7  **III.  ~~CONGRESS, THE FDA, AND THE FTC HAVE ALL RECOGNIZED~~**
8       **THAT THE CITIZEN PETITION PROCESS HAS BEEN USED (AND**
9       **ABUSED) BY NDA-HOLDERS WHO FILE CITIZEN PETITIONS FOR**
10       **THE PURPOSE OF CAUSING DELAY IN THE APPROVAL OF ANDAS**

11      19.    Congress has recognized that the Citizen Petition process has been used
12  by certain pharmaceutical companies for the improper purpose of delaying FDA
13  approval of generic products, as evidenced by the recent introduction, passage and
14  enactment into law on September 27, 2007 of amendments to the Federal Food, Drug,
15  and Cosmetic Act directing the FDA not to delay approval of ANDAs based on the
16  filing of a Citizen Petition.  See Food and Drug Administration Amendments Act of
17  2007 §914(a), 21 U.S.C. §355(q).  Remedying past abuse of the Citizen Petition
18  process was a primary motivation for passage of the legislation, as evidenced by the
19  following comments in the legislative history of the Citizen Petition Fairness and
20  Accuracy Act of 2007 that was introduced on January 4, 2007.

21      20.    "The legislation I introduce today. . . targets one particularly pernicious
22  practice by brand name drug companies to impede or block the marketing of generic
23  drugs - abuse of the FDA citizen petition process." 153 Cong. Rec. S64 (daily ed. Jan.
24  4, 2007) (statement of Sen. Kohl).

25      21.    "While this citizen petition process was put in place for a laudable
26  purpose, unfortunately in recent years it has been abused by frivolous petitions
27  ~~submitted by brand name drug manufacturers (or individuals acting on their behest)~~
28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

*19. The FDA must perform its duties with care, but without unnecessary delay, and Congress enacted the Hatch-Waxman Act "to get generic drugs into the hands of patients at reasonable prices — fast." In re*

~~whose only purpose is to delay the introduction of generic competition." 153 Cong.~~ Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

22. "Indeed, brand name drug manufacturers often wait to file citizen petitions until just before the FDA is about to grant the application to market the new generic drug solely for the purpose of delaying the introduction of the generic competitor for the maximum amount of time possible. This gaming of the system should not be tolerated." 153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

23. "Of the 21 citizen petitions for which the FDA has reached a decision since 2003, 20 -- or 95 percent of them -- have been found to be without merit. Of these, ten were identified as "eleventh hour petitions," defined as those filed less than 6 months prior to the estimated entry date of the generic drug. None of these ten "eleventh hour petitions" were found to have merit, but each caused unnecessary delays in the marketing of the generic drug by months or over a year. . . " 153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

24. In addition, FDA officials have acknowledged that there is a problem. For example, FDA's Chief Counsel Sheldon Bradshaw has stated that "Sometimes, stakeholders try to use this mechanism to unnecessarily delay approval of a competitor's products . . . [we've] already seen several examples of citizen petitions designed not to raise timely concerns with respect to legality or timeliness of the drug application, but rather to delay approvals by compelling the agency to consider arguments raised in the petition."

25. Other federal agencies have also recognized the potential for abuse in the citizen petition process and proposed ways in which to prospectively prevent it. Jon Leibowitz, FTC Commissioner, has stated that "where the cost of filing an improper petition is trivial compared to the value of securing even a brief delay in a rival's ~~entry, there's certainly an~~ incentive to misbehave." (emphasis added). ~~Declaration of~~

*Bar Labs, Inc., 930 F.2d at 76. This Court will not unnecessarily delay a process that has already taken almost ten years.*

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1   ~~Minaksi Bhatt Ex. 5.[1]   Thus, the potential for abuse – and indeed, the actual abuse~~

2   by brand companies ~~to delay~~ generic entry using the citizen ~~petition~~ process, was

3   recognized by the legislature, the FDA ~~and other~~ governmental agencies, and led to

4   the enactment of the ~~Food~~ and Drug Administration Amendments ~~Act~~ 2007.   See 21

5   ~~U.S.C. §355(q).~~

6   **IV.   SPEAR'S 5-FLUOROURACIL CREAM ANDA**

7       **A.   FDA Approved Spear's Bioequivalence Clinical Study Design**

8       26.   In 1999, Spear submitted a proposed bioequivalence clinical study design

9   to the FDA for its approval.   AR955-71.   The bioequivalence clinical study involved

10   the determination of bioequivalence in subjects with precancerous AK because

11   Efudex® is used overwhelmingly in the treatment of AK.   Declaration of K.L. Spear

12   ¶12.[2]

13       27.   The FDA engaged in extensive internal scientific deliberations and

14   ultimately determined that, as a matter of science, a study in AK would demonstrate

15   that Spear's product was bioequivalent and communicated that determination to

16   Spear.   AR938-98.

17       28.   The FDA's deliberations included three documents on which the name

18   Dr. Jonathan Wilkin appears.   Dr. Wilkin was at that time a Division Director in the

19   Office of Generic Drugs.   AR947.   The first document is a November 8, 1999 email

20   from Dr. Wilkin to Dr. Mary Fanning in the Office of Generic Drugs and Dr. Hon-

21   Sum Ko in the Office of New Drugs in which Dr. Wilkin asks whether an email from

22   Dr. Fanning "look[s] like a consult request."   Doyle Dec. Att. A.

23       29.   The second document is a three page memorandum dated November 9,

24   1999 from Dr. Ko to Dr. Fanning on which Dr. Wilkin was copied.   AR947-49.   In the

25   memorandum, there is a single paragraph in which Dr. Ko discusses whether a

26   bioequivalence clinical study in sBCC is needed.   AR949.   The document was sent

27

28

[1] The Bhatt Declaration was filed on April 28, 2008.

[2] The Spear Declaration was filed on April 28, 2008.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1   "through" Dr. Wilkin, and he signed it ten days after it was written by Dr. Ko.

2   AR947.

3        30.    The third and final document is a January 27, 2000 memorandum from

4   Dr. Ko to Dr. Fanning on which Dr. Wilkin is copied.  AR977-82.  This memorandum

5   does not discuss whether an sBCC study should be conducted.  In Dr. Fanning's letter

6   to Dr. Ko, Dr. Fanning refers to Dr. Ko's earlier memorandum as a "brief consult."

7   AR978.

8        31.    Based upon the FDA approval of its AK clinical study, Spear conducted

9   a clinical bioequivalence study in patients with AK that demonstrated that Spear's 5-

10  fluorouracil cream was bioequivalent to Valeant's Efudex® product.  AR1059-86.

11       32.    Spear has not conducted a study in subjects with sBCC.  ~~Tr. at~~

12  ~~33.    Designing and conducting such a study, including patient recruitment,~~

13  ~~could take two or more years.  Tr. at        .~~  This ~~is in part~~ due to the fact that the

14  ~~overwhelming majority of sBCC~~ patients (98%) ~~have this~~ condition treated by

15  ~~surgery, rather than through the use of Efudex®.  Tr. _____.~~

16      **B.**    **On January 6, 2005, Spear Filed its ANDA**

17       34.    Upon successful completion of its clinical study demonstrating

18  bioequivalence of its 5-fluorouracil cream product, Spear filed ANDA 77-524.

19  AR1001.

20  **V.**    **VALEANT FILED A CITIZEN PETITION ARGUING THAT AN ANDA**

21          **FOR A 5-FLUOROURACIL CREAM PRODUCT SHOULD INCLUDE**

22          **STUDIES IN BOTH AK AND SBCC**

23       35.    On December 21, 2004, Valeant filed a Citizen Petition with the FDA in

24  which it argued that the FDA should require ANDAs for 5-fluorouracil cream

25  products to include clinical studies that demonstrate bioequivalence in both AK and

26  sBCC.  AR1-138.

27  ~~3  Spear requested an expedited Transcript of the Preliminary Injunction Hearing;~~
    however, the Court Reporter ~~was not able to provide it before the~~ Proposed Findings

28  of Fact and Conclusions ~~of Law were due.  Should the Court~~ so desire, Spear will
    ~~provide the Court with an updated document as soon as it receives the transcript.~~

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

36.     Spear through its counsel submitted letters in response to Valeant's Citizen Petition in which it explained that a clinical study in AK would demonstrate bioequivalence in both AK and sBCC.  AR141-88, AR450-70, AR502-28.

37.     Valeant submitted additional letters to the FDA in support of its Citizen Petition.  AR190-449, AR472-88, AR530-71.

## VI.     FDA REJECTED VALEANT'S SCIENTIFIC ARGUMENTS AND APPROVED SPEAR'S ANDA

38.     The 1,125 page administrative record indicates that FDA engaged in extensive deliberations in its consideration of Spear's ANDA and Valeant's Citizen Petition.  AR1-1125.   The following portions of the administrative record are particularly relevant to the issues raised in this litigation.

### A.     The Hixon Memorandum Discusses, Inter Alia, That AK and sBCC Have the Same Site of Action in the Skin, That the Stratum Corneum Is the Primary Barrier to Topical Drug Delivery and Is Thickened in AK, and Addresses the Arguments Made by Each of the Three Valeant Experts

39.     In a February 20, 2007 21-page memorandum, Dr. Dena Hixon, Associate Director for Medical Affairs in the Office of Generic Drugs, provided a detailed discussion of Valeant's Citizen Petition arguments and the responses of the Office of Generic Drugs to those arguments.  AR636-56.  (This memorandum was written before Dr. Spear submitted the Wilkin letter to the FDA.)

40.     The Office of Generic Drugs is responsible for reviewing ANDAs and determining whether the proposed generic drug is bioequivalent. /Tr/at/

41.     In her memorandum, Dr. Hixon discusses in detail the site of action for AK and sBCC.  See AR638, AR640 and AR645.  The memorandum contains multiple references to scientific literature on these issues.  See, e.g., AR638 at nn.3-4, AR640 at nn.5-7.  Dr. Hixon concludes in her memorandum that AK and sBCC arise in the same location in the skin.  See AR638, AR640 and AR645.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

9

42.     In her memorandum, Dr. Hixon concluded that "the stratum corneum, the most superficial sublayer, is widely considered to be the predominant barrier to topical drug delivery" and discusses the fact that the stratum corneum is thickened in AK. AR645-46.

43.     In addition, Dr. Hixon's memorandum discusses and addresses arguments made by each of the three experts retained by Valeant to make submissions in support of its Citizen's Petition.  See AR651-53 (discussing declarations of Drs. Maibach, Tran and Fisher).

44.     As part of the review of Spear's ANDA and Valeant's Citizen Petition, the Office of Generic Drugs consulted with dermatologists in the Office of New Drugs.  AR627-739.  The Office of New Drugs is responsible for reviewing NDAs and determining whether new drug products that are the subject of such applications are safe and effective.  Tr. at ___.  The Office of New Drugs does not make bioequivalence determinations in its review of NDAs.  Tr. at ___.

45.     Dr. Hixon's memorandum also addresses the Office of Generic Drugs' views regarding issues raised by the Office of New Drugs during the consultation. AR653-66.  The record of the consultation between the Office of Generic Drugs and the Office of New Drugs indicates that some of the doctors in the Office of New Drugs are not familiar with the regulations that relate to ANDAs.  For example, Dr. Hixson's memorandum addresses issues raised by Dr. Markham Luke of the Division of Dermatology and Dental Products ("DDDP"), pointing out, inter alia, that Dr. Luke's analysis did not comport with the FDA's regulations regarding the approval of a generic drug product – as opposed to a new drug product.  See AR653.

**B.    Spear Submits The Wilkin Letter In Support of Its ANDA Approval**

46.     On March 14, 2007, Spear submitted a two page letter from Dr. Jonathan Wilkin (who had retired from the FDA in 2005) in support of its ANDA.  AR1047-58. Dr. Wilkin opined that a clinical study in patients with AK would demonstrate bioequivalence because "the greatest barrier to penetration through the skin is the

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

10

stratum corneum," the stratum corneum in sBCC is compromised, and the stratum corneum in AK is thickened. AR1048. Dr. Wilkin concluded that "the substantially greater barrier with AKs provides for an assay with greater sensitivity to detect a subtle, even clinically unimportant, difference between test and reference products." AR1048. Dr. Wilkin's two-page letter contained no references or citations to any scientific studies or published articles. AR1047-48.

47.     There is no evidence that Spear knew at the time that it retained Dr. Wilkin that Dr. Wilkin had had any involvement in the consideration of Spear's clinical study proposal when he was employed by the FDA.

**C.     The December 3, 2007 Beitz Memorandum**

48.     Dr. Julie Beitz, an oncologist and internist, was asked to review the scientific debate between the Office of Generic Drugs and the Office of New Drugs and provide her conclusions. In a December 3, 2007, twelve-page memorandum, Dr. Beitz concluded that "a single clinical study in AK would be sufficient to demonstrate bioequivalence of Efudex® 5-fluorouracil cream, 5%, and Spear's 5-fluorouracil cream, 5%, for both the AK and sBCC indications." AR736.

49.     Dr. Beitz's memorandum contains a detailed discussion of the site of action for AK and sBCC, citing the scientific literature on this subject. See AR732-34 and notes 7-11. Dr. Beitz concludes that:

> Based upon my review of the data and information describing actinic keratoses and superficial basal cell carcinomas, I conclude that both are characterized by an abnormal proliferation of cells within the epidermis, which may be involved either in part or in its entirety. I also conclude that both conditions may protrude minimally into the upper dermis while maintaining continuity with the epidermis. Thus the site of action for a topical product to treat each of these conditions is the epidermis and upper dermis.

AR734.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

11

50.   Dr. Beitz's memorandum also found that "the stratum corneum is the predominant barrier to topical drug delivery." AR734.   This language is almost identical to the language in Dr. Hixon's February 20, 2007 memorandum. AR645.

51.   Dr. Beitz also found that "[i]n many skin disorders, including tumors, the stratum corneum is compromised, and barrier resistance decreased.   As treatment progresses, the condition improves, and the barrier function of the tissue is restored thereby decreasing drug delivery. In contrast, in actinic keratosis the stratum corneum is often thickened." AR734-35 (emphasis in original).   Dr. Beitz cited the scientific literature that supports these findings. AR735-36 and n.13.

52.   Dr. Beitz concludes with eight reasons why "a single clinical study in AK would be sufficient to demonstrate bioequivalence of Efudex® 5-fluorouracil cream, 5%, and Spear's 5-fluorouracil cream, 5%, for both the AK and sBCC indications." AR736-37.

53.   In her description of the documents that were submitted to the FDA in connection with the Citizen Petition, Dr. Beitz states in a footnote, "[o]n March 14, 2007, Spear Pharmaceuticals submitted to its ANDA the expert opinion of Jonathan Wilkin, MD, supporting the adequacy of Spear's AK study to support approval of their product. Dr. Wilkin was Director of DDDP from 1994 to 2005. Dr. Wilkin does not appear to have been involved in this matter during his tenure at FDA." AR730 at n.6.   The Beitz memorandum makes no other reference to Dr. Wilkin and does not state that Dr. Beitz relied on Dr. Wilkin's opinion, nor does Dr. Beitz's memorandum cite to or rely on the Wilkin letter in support of any of her conclusions.

**D.   The 39-Month Internal Scientific Debate Within FDA Concludes with Approval of Spear's ANDA and Denial of Valeant's Citizen Petition**

54.   After 39 Months of internal scientific deliberation, FDA concluded as a matter of science that a clinical study in AK would demonstrate bioequivalence in both AK and sBCC. AR599-626, AR1084-86.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

12

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

55.     The doctors involved in the internal debate included both representatives from the Office of New Drugs and the Office of Generic Drugs.  The doctors in the Office of New Drugs included dermatologists and an oncologist, Dr. Beitz. *Tr. at ___* The Office of New Drugs is responsible for determining the safety and efficacy of new drug applications; it does not determine bioequivalence as part of the process of reviewing and approving new drugs.  The Office of Generic Drugs is responsible for determining whether the proposed generic drug is bioequivalent to the referenced new drug.  Thus, the Office of Generic Drugs is expert in determining bioequivalence.

56.     On April 11, 2008, FDA approved Spear's ANDA and denied Valeant's Citizen Petition.  AR599-626, AR1084-86.

57.     Valeant's citizen petition delayed the approval of Spear's ANDA. *Tr. at ___*

## VII.   AFTER FAILING TO CONVINCE THE FDA TO REQUIRE SPEAR TO CONDUCT A BIOEQUIVALENCE CLINICAL STUDY IN SBCC, VALEANT FILED A COMPLAINT AND APPLICATION FOR A TRO

58.     On April 25, 2008, two weeks after Spear's ANDA was approved and Valeant's Citizen Petition was denied, Valeant filed a complaint against the FDA and an application for a TRO to suspend Spear's approval.

59.     On April 28, 2008, Spear filed a motion to intervene and an opposition to Valeant's application for a TRO.

60.     On April 28, 2008, FDA filed an opposition to Valeant's application for a TRO.

61.     On April 30, 2008, Valeant filed a reply in support of its application for a TRO, and on May 30, 2008, Valeant filed a supplemental memorandum in support of its application.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**VIII. FDA REQUESTED A STAY IN ORDER TO INVESTIGATE A POTENTIAL CONFLICT OF INTEREST AND AVOID EVEN THE APPEARANCE OF ANY IMPROPRIETY AND LATER REQUESTED AN ADMINISTRATIVE STAY IN ORDER TO ADDRESS THE POTENTIAL CONFLICT ISSUE AND A SCIENTIFIC ISSUE**

62.     On April 30, 2008, the FDA requested a two week stay of proceedings so that it could consider "newly-discovery matters pertaining to the administrative record." FDA sought the stay in order to investigate a "potential conflict of interest (or the appearance thereof) concerning a former FDA employee." On May 1, 2008, the Court granted FDA's application for a stay of proceedings.

63.     During the two week stay, FDA requested an administrative stay pursuant to 21 C.F.R. §§10.33(a) and (h) and 10.35(a). FDA asked the Court to refer the matter back to the agency for administrative reconsideration and stay the proceedings pending resolution of the previously-identified issue and the agency's administrative reconsideration involving a scientific issue. On May 16, 2008, the Court granted the FDA's application for an administrative stay of proceedings.

**IX.  UPON RECONSIDERATION, FDA DETERMINED (A) THAT SPEAR'S ANDA WAS APPROVABLE WITHOUT THE WILKIN LETTER, (B) ADDITIONAL SCIENTIFIC INFORMATION WAS NOT NECESSARY, AND REAFFIRMED SPEAR'S APPROVAL; THIS DETERMINATION WAS REVIEWED AND APPROVED BY DR. THROCKMORTON WHO WAS NOT INVOLVED IN THE INITIAL APPROVAL OF THE SPEAR ANDA**

64.     On May 30, 2008, the FDA submitted to the Court memoranda that comprised FDA's decision reaffirming Spear's approval. AR1088-225.

65.     The memoranda included (1) a memorandum from Dr. Julie Beitz, Director, Office of New Drugs, to Dr. Douglas Throckmorton, Deputy Director of the Center for Drug Evaluation; (2) a twelve-page memorandum from Dr. Throckmorton

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

14

1    to Dr. Janet Woodcock, Director of the Center for Drug Evaluation; (3) a

2    memorandum from Dr. Woodcock to Dr. Andrew von Eschenbach, the Commissioner

3    of the FDA; (4) and the Decision on Administrative Reconsideration signed by Dr.

4    von Eschenbach. AR1088-225.

5        66.    Dr. Beitz in her May 29, 2008 memorandum stated that at the time she

6    wrote her December 3, 2007 memorandum she "was not aware that Dr. Wilkin had

7    been involved in this matter during his tenure at FDA." AR1107. Dr. Beitz was

8    asked "whether [she] would have reached the same conclusion as stated in [her]

9    December 3, 2007 decision, even if Dr. Wilkin had not made his March 14, 2007

10   submission in support of Spear's ANDA." AR1107. Dr. Beitz stated that "[r]emoval

11   of Dr. Wilkin's March 14, 2007 submission from consideration does not alter any of

12   the conclusions that I reached in my December 3, 2007 memo regarding the adequacy

13   of Spear's AK study to support approval of its product." AR1107.

14       67.    Dr. Beitz addressed Dr. Wilkin's statement that the stratum corneum was

15   the greatest barrier to penetration. Dr. Beitz stated that her review of the literature

16   indicated that this "observation is widely held" and cited numerous scientific

17   references for this proposition. AR1107 n.1. She also stated that the Office of

18   Generic Drugs was aware of "this well-known fact" before Dr. Wilkin's letter, citing

19   the Hixon memorandum. AR1107. Valeant has not challenged the scientific

20   correctness of Dr. Beitz's statement that this observation is widely held in the

21   literature.

22       68.    Dr. Beitz also stated that the thickness of the stratum corneum in AK and

23   sBCC is described in the scientific literature cited in her December 3, 2007

24   memorandum and in the Williams reference submitted by Valeant in support of its

25   Citizen Petition. AR1107-08. Valeant has not challenged the scientific correctness of

26   Dr. Beitz's statements that these facts were well-known in the scientific literature.

27       69.    Dr. Throckmorton, the Deputy Director of the Center for Drug

28   Evaluation and Research, then reviewed Dr. Beitz's analysis.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

15

70.   Dr. Throckmorton had not been involved in the earlier consideration and approval of Spear's ANDA.  See AR 938-1086.

71.   In a twelve page memorandum, Dr. Throckmorton recommended "that the approval of ANDA 77-524 be affirmed as both scientifically and procedurally correct." AR1091.

72.   Dr. Throckmorton's memorandum described in detail the scientific debate within FDA regarding the need for bioequivalence studies in both AK and sBCC. AR1092-95.

73.   Dr. Throckmorton stated that "the statements made by Dr. Wilkin were based on information that is generally available and could reasonably have been derived from other submitted materials" and concluded that "omitting Dr. Wilkin's statement from the record does not change the conclusion regarding the approvability of the Spear ANDA." AR1096.

74.   Dr. Throckmorton reviewed the record and concluded that FDA's "earlier decision that a single study in AK is adequate to establish bioequivalence for these products is scientifically and procedurally sound." AR1096.

75.   Dr. Throckmorton also addressed the scientific issue that caused the FDA to request the administrative stay so that it could reconsider the approval.  AR1099-1101.  He concluded that pharmacokinetic and additional efficacy information was not required for approval of Spear's ANDA. AR1100-01.

76.   Dr. Woodcock reviewed Dr. Throckmorton's memorandum and agreed "that the approval of ANDA 77-524 be affirmed as both scientifically and procedurally correct." AR1089.  She stated that the "statements made by Dr. Wilkin were based on information that is generally available and could reasonably have been derived from other submitted materials." AR1090.  She further stated that "Spear's clinical endpoint bioequivalence study in patients with AK was adequate to demonstrate bioequivalence" and "no additional pharmacokinetic data are needed to

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    support approval." AR1090. Dr. Woodcock recommended "that approval of ANDA

2    77-524 be affirmed." AR1090.

3        77.    Dr. von Eschenbach's Decision on Administrative Reconsideration states

4    that he "reconsidered the approval of Spear's ANDA 77-524 for 5-fluorouracil cream,

5    5%, and based [on] Dr. Woodcock's recommendation, the approval of the ANDA 77-

6    534 is hereby affirmed." AR1088. There is no indication in the administrative record

7    that Dr. von Eschenbach was involved in the initial approval of the Spear ANDA. See

8    AR938-1086.

9    ~~X.    THE    FDA'S    ETHICS    INVESTIGATION    OF    DR.    WILKIN~~

10   ~~CONCLUDED THAT THERE WAS NO CONFLICT OF INTEREST~~

11       ~~78.    After finding three documents in the administrative record that included~~

12   some reference to Dr. Wilkin, the Office of the General Counsel for the Department of

13   Health and Human Services, Food and Drug Division referred the potential conflict of

14   interest issue to FDA's Office of Internal Affairs, Office of Criminal Investigations.

15   Doyle Dec. ¶1.

16       79.    The Office of Internal Affairs referred the matter to the Office of

17   Investigations for the Department of Health and Human Services, Office of the

18   Inspector General. Doyle Dec. ¶3.

19       80.    The Office of the Inspector General determined that there was no conflict

20   of interest. Vantrease Dec. ¶¶4-5.

21       81.    Mr. Vantrease concluded that:

22       the referral did not provide sufficient information to support that Dr.

23       Wilkin knew that his letter would be presented to the agency, as

24       required by 18 U.S.C. §207(a)(1). In addition (and even if he did

25       know that the letter would be presented to FDA), I concluded that the

26       information showed that <u>Dr. Wilkin was two supervisory levels above</u>

27       <u>the Medical Officer conducting the review, and that there was nothing</u>

28       ~~else indicating that he was personally and substantially involved in the~~

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

17

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

73. Valeant has not made a sufficient showing of an ethical violation.

1    ~~matter at hand, as required for the permanent restriction relating to~~

2    ~~former employees under 18 U.S.C. §207(a)(1)(B). The one-year~~

3    ~~restriction in 18 U.S.C. §207(c) on communicating to the government~~

4    ~~would not apply to Dr. Wilkin (regardless of whether he qualified as a~~

5    ~~senior personnel) because he left HHS in 2005, and his expert opinion~~

6    ~~was written on March 14, 2007.~~

7    Vantrease Dec. ¶4 (emphasis added).

8        82.    Mr. Vantrease determined "that no further investigation of this matter

9    was warranted." Vantrease Dec. ¶5.

10       83.    Mr. Doyle notified the Office of the General Counsel "that neither

11   HHS/OIG nor the Office of Internal Affairs would take any action against Dr.

12   Wilkin." Doyle Dec. ¶5.

13   **XI.  IN VIEW OF AN FDA WARNING LETTER THAT DESCRIBES**

14   **VALEANT'S EFUDEX® PRODUCT AS "ADULTERATED," THERE IS**

15   **A RISK THAT VALEANT WILL BE FORCED TO CEASE SELLING**

16   **ITS EFUDEX® PRODUCT**

17       84.    On May 7, 2008, the company that manufacturers Valeant's Efudex®

18   product (in a plant that it purchased from Valeant in 2007) received a Warning Letter

19   from the FDA advising that Valeant's Efudex® product was not manufactured in

20   accordance with Current Good Manufacturing Practices ("CGMP"), thus "rendering

21   the drug adulterated" within the meaning of the Federal Food, Drug, and Cosmetic

22   Act. Declaration of Lisa N. Phillips ("Phillips Dec.") Ex. F.[4]

23       85.    The FDA warning letter found that "the manufacture and processing of

24   the [Valeant] drug do not conform with CGMP to assure that the drug product meets

25   the requirements of the Act as to safety, and has the identity and strength and meets

26   the quality and purity characteristics that it purports or is represented to possess."

27   Phillips Dec. Ex. F.

28

---

[4] ~~The Phillips Declaration was filed on June 6, 2008.~~

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

86. ~~These adulterated batches of Efudex® are currently within their~~ expiration labeling and presumably are still on distributor shelves.

87. According to the FDA's Warning Letter, the manufacturing problems with respect to Valeant's Efudex® product have been ongoing since August 2005, when Valeant still owned the plant. Phillips Dec. Ex. F at p. 1. These issues have been reported to the FDA in various Field Alert Reports and have indicated "a pattern of variability in key quality attributes of [the] Efudex® Topical Cream 5% drug product." Id. at p. 1.

> Since August 2005, your analyses of retained lots (as part of complaint investigations) and stability samples (as part of your ongoing stability program) revealed at least 11 instances of failure to meet specifications for assay, appearance and/or . . . content . . . your manufacturing process is not well-controlled and/or is not designed to ensure that all dosage units within a lot are of appropriate quality throughout their expiry period.

Id. at pp. 1-2 (emphasis added).

88. During the first one year and nine months of the manufacturing problems, Valeant was directly responsible for addressing those problems to the FDA's satisfaction. The FDA stated in its Warning Letter that Valeant "observed anomalies" prior to April 2007 in manufacturing and control records but "did not take the next step necessary to correct this problem on a process-wide level." Phillips Dec. Ex. F at p. 2.

89. Based on the repeated problems discussed above with manufacturing, variability and stability issues, the FDA conducted an inspection of the Puerto Rico manufacturing facility from September 10-28, 2007. Phillips Dec. Ex. F at p. 1. As a result of that inspection, the FDA concluded:

> The inspection revealed that your firm's manufacture, processing, ~~packaging or holding of the human drug product Efudex® Topical Cream~~

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

5% deviates from the Current Good Manufacturing Practice (CGMP) Regulations as stated within 21 CFR Parts 210 and 211, rendering the drug <u>adulterated</u> within the meaning of 21 U.S.C. § 351(a)(2)(B) . . . <u>The manufacture and processing of the drug do not conform with CGMP to assure that the drug product meets the requirements of the Act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess.</u>

<u>Id</u>. (emphasis added).

90.    FDA's regulations provide that because CGMP have not been followed during the manufacturing of the Efudex® cream product, it may be subject to recall or seizure.  21 C.F.R. §7.40(a).

91.    Multiple batches of adulterated product are within their expiry dates and, in the absence of a recall, are presumably still sitting on the shelf waiting to fill patient's prescriptions.    Specifically, the FDA cites eight lots with various manufacturing issues, three of which are still well within their expiry dates.  Phillips Dec. Ex. F at pp. 4-5.  These lots included one listed in a Field Alert Report submitted as recently as January 17, 2008.  <u>Id</u>. at p. 4.

As patients apply this cream daily to their lesion(s), it is their reasonable expectation that all portions of the cream in every tube are homogeneous and equally potent.  Our inspection found that <u>the consistency and uniformity of your drug product's quality is not assured.</u>

<u>Id</u>. at p. 5 (emphasis added).

92.    Valeant has not even attempted to explain to this Court why its product is not adulterated, stating only that it will respond in due course to the FDA Warning Letter.  Valeant gave this Court no assurance that its Efudex® product will remain on the market.

**CONCLUSIONS OF LAW**

**I.     THE APPLICABLE LAW**

    **A.     The Preliminary Injunction Standard**

1.     To be entitled to issuance of a preliminary injunction, a plaintiff must "demonstrate[] <u>either</u> a combination of probable success on the merits and the possibility of irreparable injury <u>or</u> that serious questions are raised and the balance of hardships tips sharply in [its] favor." <u>Save Our Sonoran, Inc. v. Flowers</u>, 408 F.3d 1113, 1120 (9th Cir. 2005) (emphasis in original) (citation omitted).

2.     "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." <u>Id.</u> (citations omitted).

3.     "Under <u>any</u> formulation of the test, the moving party must demonstrate a <u>significant</u> threat of irreparable injury." <u>Arcamuzi v. Continental Air Lines, Inc.</u>, 819 F.2d 935, 937 (9th Cir. 1987) (emphasis added) (citation omitted). <u>See also</u>, <u>Whittier College v. ABA</u>, No. 07-1817, 2007 U.S. Dist. LEXIS 43707, at *16 (C.D. Cal. May 7, 2007).

4.     Injunctive relief "is a drastic and extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." <u>Avila v. Stearns Lending, Inc.</u>, No. 08-0419, 2008 U.S. Dist. LEXIS 31813, at *2 (C.D. Cal. Apr. 7, 2008) (Guilford, J.).

5.     The burden remains on Valeant even though this Court has granted it temporary relief.  <u>Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers</u>, 415 U.S. 423, 442-43 (1974).

6.     "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" <u>Stanley v. Univ. of S. Cal.</u>, 13 F.3d 1313, 1320 (9th Cir. 1994), <u>cert</u>. <u>denied</u>, 528 U.S. 1022 (1999) (citation omitted).

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1    7.    "It is well established . . . [that] monetary injury is not normally

2  considered irreparable." <u>Los Angeles Memorial Coliseum Comm'n. v. NFL</u>, 634 F.2d

3  1197, 1202 (9th Cir. 1980).

4    8.    "To successfully shoehorn potential economic loss into the irreparable

5  harm requirement, a plaintiff must establish that the economic harm is so severe as to

6  cause extreme hardship to the business or threaten its very existence." <u>Apotex, Inc. v.</u>

7  <u>FDA</u>, No. 06-0627, 2006 U.S. Dist. LEXIS 20894, at *54-56 (D.D.C. Apr. 19, 2006)

8  (internal quotations and citation omitted).

9    9.    "Speculative injury does not constitute irreparable injury." <u>Goldie's</u>

10  <u>Bookstore, Inc. v. Super. Ct. of Cal.</u>, 739 F.2d 466, 472 (9th Cir. 1984) (citation

11  omitted). <u>See also</u>, <u>CKE Rest. v. Jack in the Box, Inc.</u>, 494 F. Supp. 2d 1139, 1148

12  (C.D. Cal. 2007) (Guilford, J.).

**B.    The Standard of Review under the APA**

14    10.    Administrative decisions can only be overturned if they are "arbitrary,

15  capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

16  §706(2)(A).

17    11.    Under the APA, "[t]he ultimate standard of review is a narrow one. The

18  court is not empowered to substitute its judgment for that of the agency." <u>Zeneca, Inc.</u>

19  <u>v. Shalala</u>, 213 F.3d 161, 167 (4th Cir. 2000) (citation omitted). <u>See also</u>, <u>Bristol-</u>

20  <u>Myers Squibb Co. v. Shalala</u>, 923 F. Supp. 212, 216 (D.D.C. 1996).

21    12.    In order for agency action to be overturned as arbitrary and capricious,

22  there must have been "no rational basis for the action" taken. <u>Friends of the Earth v.</u>

23  <u>Hintz</u>, 800 F.2d 822, 831 (9th Cir. 1986) (citation omitted).

24    13.    "[T]he court must consider whether the decision was based on a

25  consideration of the relevant factors and whether there has been a clear error of

26  judgment." <u>Id.</u>    (internal quotation and citation omitted).    Such review is

27  accomplished not by "de novo review of the action itself [but by] focus instead on the

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1  agency's decisionmaking process." <u>Ranchers Cattlemen Action Legal Fund United</u>

2  <u>Stockgrowers of Am. v. USDA</u>, 499 F.3d 1108, 1117 (9th Cir. 2007).

3       14.   Agency action is not in accordance with the law if it (1) "is based upon

4  an erroneous interpretation or misapplication of relevant statutory provisions"

5  (<u>Louisville & N.R. Co. v. U.S.</u>, 268 F. Supp. 71, 75 (W.D. Ky. 1967), <u>rev'd</u> <u>on</u> <u>other</u>

6  <u>grounds</u>, <u>sub</u> <u>nom</u>, <u>Am. Comm. Lines, Inc. v. Louisville & N.R. Co.</u>, 392 U.S. 571

7  (1968); (2) "violates a published regulation" (<u>Washington Mechanical Contractors,</u>

8  <u>Inc. v. U.S. Dept. of Navy</u>, 612 F. Supp. 1243, 1248 (N.D. Cal. 1984)); or, (3) is not in

9  accordance with case law directly bearing on the legal question at issue (<u>Whitaker v.</u>

10  <u>Thompson</u>, 248 F. Supp. 2d at 1, 13 (D.D.C. 2002)).

    **C.**    **The Conflict of Interest Rules**

12       15.   Former governmental employees are restricted from certain activities

13  once they have left public service. <u>See</u> 18 U.S.C. §207. If the former employee

14  "participated personally and substantially" in a matter while a public servant, he may

15  not "knowingly make . . . with the intent to influence, any communication to or

16  appearance before any officer or employee of any . . . agency. . . of the United States .

17  . . on behalf of another person." <u>Id.</u>

18       16.   In order to have participated "personally," the former employee must

19  have participated "directly" in the matter while employed by the government. 5

20  C.F.R. §2637.201(d)(1).

21       17.   Participation is not "substantial" as required by the statute unless "the

22  employee's involvement [was] of significance to the matter, or form[ed] a basis for a

23  reasonable appearance of such significance." 5 C.F.R. §2637.201(d)(1). Substantial

24  participation "requires more than official responsibility, knowledge, perfunctory

25  involvement, or involvement on an administrative or peripheral issue." <u>Id.</u>

26       18.   "'Personal and substantial participation' is different from 'official

27  responsibility.'" 5 C.F.R. § 2637.201(d)(3). Official responsibility "is defined as 'the

28  direct administrative or operating authority, whether intermediate or final, and either

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1    exercisable alone or with others, and either personally or through subordinates, to
2    approve, disapprove, or otherwise direct Government action.'" <u>CNA Corp. v. U.S.</u>,
3    No. 08-249, 2008 U.S. Claims LEXIS 121, at *27 (Fed. Cl. Apr. 30, 2008) (quoting
4    18 U.S.C. § 202; 5 C.F.R. § 2637.202(b)).

5        **D.     The Administrative Record after Reconsideration Includes the**
6              **Documents Relating to the Reconsideration**

7        19.    When the FDA initiates reconsideration of a decision pursuant to 21
8    C.F.R. §10.33(a), "[t]he administrative record of the proceeding is to include <u>all</u>
9    <u>additional documents</u> relating to such reconsideration."    21 C.F.R.  §10.33(h)
10   (emphasis added).

11       **E.     Government Officials Are Presumed to Have Acted Correctly and in**
12              **Good Faith**

13       20.    "[T]here is a presumption of legitimacy accorded to the Government's
14   official conduct." <u>National Archives & Records Admin. v. Favish</u>, 541 U.S. 157, 174
15   (2004) (citing <u>United States Dep't of State v. Ray</u>, 502 U.S. 164, 178-79 (1991)).

16       21.    In order to displace the presumption, clear evidence to the contrary must
17   be present. <u>Id.</u>

18       22.    Moreover, "[g]overnment officials . . . are presumed to have acted in
19   good faith." <u>Seattle Audubon Society v. Lyons</u>, 871 F. Supp. 1291, 1318 (W.D.
20   Wash. 1994) (citing <u>Hoffman v. U.S.</u>, 894 F.2d 380, 385 (Fed. Cir. 1990)).

21       ~~**F.     Recall Is Appropriate Only When the FDA Has Determined That**~~
22              ~~**There Is a Risk of Illness or Injury or Gross Consumer Deception**~~
23              ~~**and It Is Necessary to Protect the Public Health and Welfare**~~
24       ~~23.    The FDA may request that a drug company recall a consumer product~~
25   ~~only if the FDA has determined that a product "presents a risk of illness or injury or~~
26   ~~gross consumer deception" and "agency action is necessary to protect the public~~
27   ~~health and welfare." 21 C.F.R. §7.45(a)(1).~~
28

**II.   VALEANT HAS NOT DEMONSTRATED THAT IT HAS A LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THE FDA'S REAFFIRMATION OF SPEAR'S APPROVAL WAS NOT ARBITRARY AND CAPRICIOUS OR NOT IN ACCORDANCE WITH LAW**

    **A.   The FDA's Scientific Determinations Are Within the Agency's Area of Expertise and Are Accorded Great Deference by Courts**

24.   Following an exhaustive and comprehensive review of the administrative record, the FDA on May 30, 2008 concluded that Spear's 5-fluorouracil product is safe, effective, and bioequivalent and reaffirmed Spear's approval.

25.   Because determinations regarding safety, efficacy, and bioequivalence are within the FDA's area of scientific expertise, the FDA's reaffirmance of Spear's ANDA approval is accorded great deference by this Court.  See, e.g. Zeneca, Inc. v. Shalala, 213 F.3d 161 (4th Cir. 2000) (ANDA approval upheld based on the FDA's scientific assessment and application of its express regulations); Warner-Lambert Co. v. Shalala, 202 F.3d 326 (D.C. Cir. 2000) (ANDA approval upheld based on FDA's determinations and regulations regarding the definition of a "dosage form"); Serono Labs. v. Shalala, 158 F.3d 1313 (D.C. Cir. 1998) (ANDA approval upheld based on FDA's determination that in vitro testing was sufficient to demonstrate bioequivalency); Schering Corp. v. FDA, 51 F.3d 390, 399 (3d Cir.), cert. denied, 516 U.S. 907 (1995) (ANDA approval upheld because, although bioequivalence is required by statute, Congress did not intend "to limit the discretion of the FDA in determining when drugs were bioequivalent for purposes of ANDA approval"); Biovail Corp. v. FDA, 519 F. Supp. 2d 39, 47 (D.D.C. 2007) (ANDA approval upheld based on the FDA's "scientific research and judgment" regarding the generic drug's safety and effectiveness and determination that the proposed labeling was proper); Somerset Pharms. v. Shalala, 973 F. Supp. 443, 453 (D. Del. 1997) (ANDA approval upheld based on the FDA's wide discretion in what types of testing are required to demonstrate bioequivalence); Upjohn Co. v. Kessler, 938 F. Supp. 439, 444 (W.D.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

25

1  Mich. 1996) (denying request for a preliminary injunction prohibiting the FDA from

2  approving applicant's ANDA based on the FDA's safety analysis and determinations);

3  Bristol-Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 220 (D.D.C. 1996) (ANDA

4  approval upheld based on the FDA's wide discretion regarding the type of testing

5  required to demonstrate bioequivalence); Fisons Corp. v. Shalala, 860 F. Supp. 859

6  (D.D.C. 1994) (ANDA approval without submission of certain in vivo testing upheld).

7       26.    Congress has assigned the task of evaluating ANDAs to the FDA.  It has

8  also established a process by which generic drugs are approved – a process that does

9  not require ANDAs to be reviewed in the same fashion as are applications for new

10  drug products.

11      27.    The FDA is an agency with scientists and scientific expertise. ~~This Court~~

12  ~~does not have the expertise to make the scientific and medical judgments inherent in~~

13  ~~the approval of a generic pharmaceutical product.~~  The FDA has trained personnel

14  able to evaluate the scientific merits of issues like whether sBCC and AK occur at the

15  same site, whether an active ingredient that reaches that site of action in AK patients

16  will also do so in sBCC patients, which condition is "easier to treat" and – ultimately

17  – whether the Spear and Valeant products are bioequivalent.

18      28.    Valeant is asking this Court to order the FDA to suspend its approval of

19  Spear's ANDA and to evaluate, using its scientific expertise, certain scientific and

20  medical issues.  But as described in great detail in the May 30, 2008 memorandum by

21  Dr. Throckmorton, the FDA has done just that.  And the result of its scientific and

22  medical examination was a conclusion rejecting each of the scientific arguments

23  advanced by Valeant and reaffirming the FDA's earlier conclusion that the Spear

24  product is safe, effective, and bioequivalent and that Spear's ANDA was properly

25  approved.  This Court will not disturb that scientific judgment.

26      29.    The FDA's decision reaffirming Spear's approval responds to the

27  arguments made by Valeant in its Citizen Petition and to this Court.  Valeant argues

28  that sBCC originates in a different layer of the skin than AK and that it is therefore not

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

reasonable to conclude that successful treatment of AK indicates equivalence in treatment of sBCC, citing the opinion of Dr. Khanh P. Tran submitted by Valeant during the citizen petition process. In its decision, the FDA cites "ample evidence in the literature" that the two conditions arise in "adjacent layers of the epidermis" and that because the real barrier to penetration is the stratum corneum, which is thickened in AK and compromised in sBCC, an AK study is more likely to provide more suitable information regarding bioequivalency. AR1096-97.

30. Valeant argues that sBCC is the more "serious condition" and requires more drug since the FDA required labeling contains the caution that only the 5% strength should be used in the treatment of sBCC. The FDA responded that Valeant's expert, Dr. Dennis Fisher, M.D., presents hypothetical dose-response curves and has provided "no clinical data showing that sBCC actually requires exposure to higher concentrations of 5-FU than are needed to treat AK." AR1098. The FDA also determined that, because there is a higher clearance rate for sBCC when treated with Efudex® cream than there is for AK, based on the success rates in each condition, neither is "difficult to treat." AR1097.

31. Valeant argues that the FDA "disregarded" the opinion of its expert Dr. Howard Maibach who stated that AK studies are inherently unreliable because they are based on objective physician diagnosis and determination of treatment success. The FDA responded that "Dr. Maibach fail[ed] to discuss the variability of sBCC . . . [both in its] diagnosis and in terms of the duration of therapy required for treatment." AR1097. In addition, the FDA stated that, even if his assertions were valid, "the study conducted by Spear was designed to lessen the impact of such variability . . . [and was] robust and carefully planned (with FDA input)." AR1097, AR1099.

32. Valeant argues that the FDA offered a study which "demonstrates" that doses at 0.5 and 5% fluorouracil cream were equally effective in treating AK and then allegedly contradicted itself by determining that a clinical study directed at treatment of AK is sufficient to demonstrate bioequivalence in both AK and sBCC. The FDA

1    responded that the statement it made in the denial of the citizen petition was taken out

2    of context and that the paper itself cannot support the conclusion Valeant suggests

3    because it suffers from numerous deficiencies in the study design and unknown effects

4    on the results by uncontrolled variables. AR1097-98.

5        33.    Valeant argues that the Office of Generic Drugs ignored the opinions of

6    the expert dermatologists in the Office of New Drugs citing memoranda authored by

7    Dr. Markham Luke. AR627-30, AR633-35.  The administrative record indicates that

8    there was a spirited scientific debate among the scientists at DDDP and the Office of

9    Generic Drugs, as well as their supervisors and that the opinions upon which Valeant

10   relies were considered.  However, it was ultimately determined by the experts in

11   bioequivalence in the Office of Generic Drugs that an sBCC clinical study was not

12   required.  Moreover, Valeant ignores the fact that Dr. Beitz, an oncologist and

13   internist in the Office of New Drugs and the supervisor of the dermatologists in the

14   Office of New Drugs (including the much more junior Dr. Luke), was of the opinion

15   that an sBCC study was not needed.

16       34.    The Court of Appeals for the District of Columbia in <u>Serono</u>, 158 F.3d

17   1313, was faced with a factually similar argument.  The company that sold the brand

18   name drug filed a citizen petition asking the FDA not to approve generic drug

19   applications based on certain scientific arguments. Serono, 158 F.3d at 1316-17.  The

20   FDA denied the citizen petition, and the brand name drug company sought a

21   preliminary injunction ordering FDA to suspend the approval of the generic drug

22   company.  <u>Serono</u>, 158 F.3d at 1317.  The district court granted the preliminary

23   injunction, and the court of appeals reversed because "[t]he district court appeared to

24   grant the FDA's determination less than this usual deference because internal FDA

25   memoranda indicated there was some disagreement among FDA chemists . . .

26   deference is owed to the decisionmaker authorized to speak on behalf of the agency,

27   not to each individual agency employee." <u>Serono</u>, 158 F.3d at 1321 (internal citations

28   omitted).  The court of appeals noted that "were we to hold otherwise, we would

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

28

1    effectively empower any individual employee not just to veto the views of the agency
2    head, but to preclude any deference to the agency at all, since we would have no basis
3    for deciding to whose view we should defer." Serono, 158 F.3d at 1321. The court of
4    appeals concluded that it owed deference to the view of the agency's authorized
5    decision maker. Serono, 158 F.3d at 1321. In this case, the authorized decision maker
6    in connection with Spear's original approval was the Office of Generic Drugs, not the
7    dermatologists in the Office of New Drugs, and the authorized decision makers in
8    connection with the reaffirmation of Spear's approval were Drs. Throckmorton,
9    Woodcock, and von Eschenbach.

10       35.   Valeant argues that in June 2006 Dr. Beitz was of the view that an sBCC
11   study was needed, citing the minutes of a meeting that was attended by numerous
12   representatives from the Office of New Drugs and the Office of Generic Drugs.
13   AR631-32. The statements in the minutes are not attributed to anyone in particular
14   and there is no indication that Dr. Beitz agreed or disagreed with the conclusion.
15   Moreover, Valeant's arguments are contradicted by a later memorandum by Dr. Luke
16   concerning the need for an sBCC study. AR633-35. If Dr. Beitz and others were
17   convinced that an sBCC study was necessary at the time of the June 2006 meeting,
18   then there would have been no need for Dr. Luke's September 2006 memorandum.

19       36.   Valeant argues that Dr. Hixon's memorandum was rejected by the
20   dermatologists in the Office of New Drugs, including Dr. Beitz, citing a memorandum
21   by Dr. Luke and Dr. Patricia Brown, a Medical Officer, to the Office of Generic
22   Drugs. AR657-61. The memorandum is "through" Dr. Beitz and Dr. Susan Walker,
23   Division Director; however, there is no indication that they agreed with the views of
24   Drs. Luke and Brown. For example, while the authors signed the memorandum,
25   neither Dr. Beitz nor Dr. Walker signed.

26       37.   Valeant argues that Dr. Wilkin's letter convinced Dr. Beitz and others
27   that an sBCC study was not necessary; however, Valeant has failed to point to
28   evidence in the record that Dr. Beitz's view was influenced, or in any way affected, by

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

29

1  ~~the two page letter submitted by Dr. Wilkin.  As demonstrated above, Valeant has~~

2  only been able to identify ~~evidence that mere junior~~ doctors in the Office of New

3  ~~Drugs who reported to Dr. Beitz were of the view that an sBCC study was necessary.~~

4      38.    Valeant argues that FDA should require Spear to submit pharmacokinetic

5  data in support of its ANDA approval.  The FDA's decision to reaffirm Spear's

6  approval is within its area of expertise and, as such, is entitled to great deference from

7  any reviewing court.  See, e.g., Biovail Corp., 519 F. Supp. 2d at 47; Allergan, Inc. v.

8  Crawford, 398 F. Supp. 2d 13, 22 (D.D.C. 2005) (internal quotations and citation

9  omitted).  See also, Zeneca, 213 F.3d at 170; Schering Corp., 51 F.3d at 399;

10  Somerset Pharms., 973 F. Supp. at 453; Upjohn, 938 F. Supp. at 444; Bristol-Myers

11  Squibb Co., 923 F. Supp. at 220; Fisons, 860 F. Supp. at 966-67.

**B.     Valeant's Argument That FDA's Procedure on Reconsideration Was Tainted Is Without Merit**

12
13
14      39.    Valeant has argued that FDA's procedure on reconsideration was tainted

15  because the same FDA personnel who were involved in the original approval of

16  Spear's ANDA were also involved in its reconsideration.  This argument is factually

17  incorrect because Dr. Douglas Throckmorton was involved in the reconsideration, but

18  was not involved in the original ANDA approval process.

19      40.    FDA took the responsible course of action and requested a stay of

20  proceedings in order to assess the effect, if any, of a potential conflict of interest and

21  to determine whether any additional scientific data were needed in support of Spear's

22  ANDA approval.    Four high-ranking FDA officials were involved in the review

23  process (two of whom – Drs. Throckmorton and von Eschenbach – were not involved

24  in the original approval) and they unanimously agreed that Spear's approval should be

25  reaffirmed.  National Archives & Records Admin., 541 U.S. at 174 (citing United

26  States Dep't of State, 502 U.S. at 178-79) ("there is a presumption of legitimacy

27  accorded to the Government's official conduct."); Seattle Audubon Society, 871 F.

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

30

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    Supp. at 1318 (citing <u>Hoffman</u>, 894 F.2d at 385) (Moreover, "[g]overnment officials . . . are presumed to have acted in good faith.").

2

3        41.    Furthermore, there is no legal requirement that "new" agency personnel must be involved in the reconsideration process.

4

5    42.    Valeant's argument that the procedure was tainted because of the potential conflict of interest concerning the Wilkin letter must fail for the additional reason that the FDA Office of Internal Affairs and the Office of the Inspector General in the Department of Health and Human Services have now determined that there was no ethical violation. Even if this Court were of the view that a different procedure should have been followed, there has been no harm done since, upon examination of the facts by the FDA officials charged with applying the conflict of interest regulations, they determined that there was no underlying ethical violation. Therefore, no purpose would be served by a remand to the agency for review by additional agency personnel who were not involved in the consideration of Spear's ANDA or Valeant's Citizen Petition.

16       43.    Valeant argues that Dr. Beitz's May 2008 memorandum constitutes "post hoc rationalization." The District Court for the District of Columbia in <u>Alpharma, Inc.</u> <u>v. Leavitt</u>, 460 F.3d 1, 6 (D.C. Cir. 2006), rejected a similar argument from the plaintiff there because "if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives." The court further explained that the rule against "post hoc rationalization" bars reliance by the agency on "rationalizations offered for the first time in litigation affidavits and arguments of counsel," but "does not prohibit the agency from submitting an amplified articulation of the distinctions it sees." <u>Alpharma</u>, 460 F.3d at 6-7 (citation omitted). Thus, in this case, it was permissible for the FDA in its reconsideration of Spear's approval to request that Dr. Beitz review her work and prepare her May 2008 memorandum and it was equally permissible for Drs.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

31

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1  Throckmorton to evaluate and concur in that memorandum and Drs. Woodcock and

2  von Eschenbach to rely on Dr. Throckmorton's conclusions.

3      44.    Valeant's argument that Dr. Beitz must have relied on Dr. Wilkin's letter

4  because of the similarity in the language in the two documents ignores the fact that Dr.

5  Beitz's twelve page memorandum includes citations to the scientific literature and

6  detailed analysis that do not appear anywhere in Dr. Wilkin's two page letter.  It also

7  ignores the fact that similar language is found in the pre-Wilkin Hixon memorandum.

8  **III.    THE PUBLIC WILL BE HARMED IF A PRELIMINARY INJUNCTION**

9          **IS ENTERED**

10      45.    Congress has determined that the American people benefit from the

11  availability of a substitute generic product because such availability results in

12  significant cost savings to the public.    In re Barr Labs, Inc., 930 F. 2d at 76.  ~~The~~

13  ~~Spear 5 fluorouracil cream product is the first genuine generic Efudex® product,~~

14  ~~AR1965 (no other ANDA submissions have been made with Efudex® cream 5% as~~

15  ~~the reference listed drug).~~  The product sold by Oceanside (a wholly-owned subsidiary

16  of Valeant) is an authorized generic that offers no real cost savings to the public.  As

17  discussed below, unlike the Spear product, the other fluorouracil products on the

18  market are not substitutable for Efudex® (that is, not "AB-rated").  See, e.g., AR1163

19  (listing Fluoroplex® and Carac® as NDA products, thus not substitutable as generics

20  to Efudex®); Tr. at ____.

21      46.    The finding in the FDA's Warning Letter to Valeant that the Valeant

22  product is adulterated has a potentially serious impact on this Court's evaluation of the

23  public interest.  The Spear product has been found by the FDA to be safe and

24  effective.  By contrast, Valeant has now had, for several years, serious manufacturing

25  problems with its product.  It is possible that at some point in the near future Valeant,

26  which has seemingly been unable or unwilling to fix its manufacturing problems, will

27  be barred from continued sales of its product.  If that were to happen, and this Court

28  ~~were to grant the requested preliminary injunction, then the American public would be~~

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    ~~entirely deprived of the 5% fluorouracil cream product that all agree is an effective~~

2    ~~treatment for patients with sBCC and AK.~~

3        47.   At the preliminary injunction hearing, Valeant presented attorney

4    argument that in the event that Spear's approval is suspended and Valeant's product is

5    recalled that the public will not be harmed because there are four other 5-fluorouracil

6    products available – Aldara®, Carac®, Fluoroplex®, and a solution product sold by

7    Taro. Tr. at _____. (Valeant provided no evidence that any of these products would be

8    an adequate substitute.)

9        48.   None of these products are substitutes for Spear's generic 5-fluorouracil

10   cream product and Valeant's Efudex® product. The active ingredient in Aldara® is

11   imiquimod, not 5-fluorouracil. Tr. at _____. Carac® is a 0.5% 5-fluorouracil cream

12   and Fluoroplex® is a 1% 5-fluorouracil cream, while the Spear and Valeant products

13   contain 5% fluorouracil. AR1163; Tr. at _____. Taro sells a solution product, not a

14   cream product. Solutions that contain 5-fluorouracil are not substitutable for, and are

15   much more irritating than, cream products. Tr. at _____. Because of the irritation

16   patients experience with the solution product, only one 5-fluorouracil solution

17   ~~prescription is written for every one hundred 5-fluorouracil cream prescriptions. Tr. at~~

18

19   **IV.   SPEAR WILL BE IRREVOCABLY HARMED IF AN INJUNCTION IS**

20         **ENTERED**

21       49.   The harm to Spear in the event that a preliminary injunction issues is a

22   threat to the survival of the company both in terms of revenue and reputation. Spear's

23   generic fluorouracil product is one of only two products it sells and constitutes 80% of

24   Spear's projected sales for 2008. Declaration of K.L. Spear ("Spear Dec.") ¶2.[5]   In

25   contrast, Efudex® accounts for less than 10% of Valeant's sales.

26       50.   Further, if such an order were to issue, Spear would not be able to fill

27   reorders which have been piling up since the first stay was initiated at the end of

28

---

[5] The Spear Declaration was filed on June 6, 2008.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1   April.   Spear Dec. ¶3.   The blow to Spear's ability to fill reorders and meet the

2   demand for its generic product will damage Spear's reputation – a harm that will make

3   it difficult for a small company with only two products to survive.  Spear Dec. ¶3.

4        51.   Valeant argues that its goodwill will suffer if patients are dispensed

5   Spear's generic product.  This argument ignores the fact that the FDA has determined

6   that Spear's product is safe, effective, and bioequivalent, and Valeant has failed to

7   identify any scientific evidence to the contrary.

8        52.   Valeant's argument also does not give the consuming public enough

9   credit.  While the Valeant product is dispensed in a tube that bears the brand name,

10  Efudex®, and the Valeant name, the Spear product is dispensed in a tube that includes

11  the generic name of the active pharmaceutical ingredient, 5-fluorouracil, and the name

12  of its manufacturer, Spear.

13  **V.   THE HARM TO SPEAR WOULD GREATLY EXCEED THE HARM TO**

14  **VALEANT**

15       53.   Valeant receives less than 10% of its revenues from the sale of Efudex®.

16  Declaration of Minaksi Bhatt Ex. 3.[6]  Valeant has also authorized a generic company

17  (Oceanside) to sell an "authorized generic" version of Efudex®.  Declaration of K.L.

18  Spear ¶20.[7]  Thus, if sale of the Spear product were to resume, Valeant would likely

19  lose, at most, 4% of its revenues.  While the Court does not wish to diminish the

20  significance of any lost revenue, a 4% revenue loss – particularly on a product that has

21  been off-patent for more than a decade and for which competition could reasonably be

22  expected – is far outweighed by the significance of an 80% loss of revenue to a

23  fledgling company.

24  **VI.   VALEANT IS NOT ENTITLED TO A PRELIMINARY INJUNCTION**

25  **ORDERING THE FDA TO SUSPEND SPEAR'S APPROVAL.**

26       54.   Valeant has not established a likelihood of success on the merits.

27

28  [6] The Bhatt Declaration was filed on April 28, 2008.

[7] The Spear Declaration was filed on April 28, 2008.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

34

55. The entry of a preliminary injunction is not in the public interest.

56. The harm to Valeant is ~~speculative and is~~ outweighed by the harm to Spear.

57. Therefore, Valeant is not entitled to a preliminary injunction ordering the FDA to suspend Spear's approval.

~~58.   For the reasons set forth above, a preliminary injunction should not be entered.   However, if the Court decides to enter a preliminary injunction, then the following sections are relevant.~~

~~**VII.  IN THE EVENT THAT A PRELIMINARY INJUNCTION IS ENTERED AND SPEAR'S ANDA APPROVAL IS SUSPENDED, A RECALL IS NOT REQUIRED**~~

1. FDA regulations provide for recall only if the FDA determines that a product "presents a risk of illness or injury or gross consumer deception" and that "agency action is necessary to protect the public health and welfare."  21 C.F.R. § 7.45(a)(1).

2. Even if this Court enters a preliminary injunction, it will only have the effect of suspending the approval.  A recall is not necessary absent findings related to illness, injury, deception, or protection of public health and welfare.  Such findings are not warranted based on the administrative record before the Court.

**VIII. IN THE EVENT THAT A PRELIMINARY INJUNCTION IS GRANTED, VALEANT SHOULD BE ORDERED TO POST A BOND**

1. Spear projects monthly sales, absent a preliminary injunction, of $2.05M.  Spear's incremental profit margin on those sales is in excess of 90%.

2. In the Ninth Circuit, the average time from filing of the Notice of Appeal to disposition is approximately seventeen months.

3. Therefore, Valeant is required to post security in the amount of $31.4M to pay the cost and damages sustained by Spear if it is found that the preliminary injunction was wrongfully issued.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

4.    If the Valeant product is recalled or if further sales by Valeant are halted, Spear would be the sole source for 5-fluorouracil cream, USP 5%. If Spear is the sole source, it projects monthly sales, absent a preliminary injunction, of $4.3M.

5.    Therefore, if the Valeant is product is recalled or if further sales of Efudex® are halted, Valeant is ordered to increase this order to $65.8M within 48 hours of any such action by the FDA. This increased bond is necessary to pay the cost and damages sustained by Spear if it is found that the preliminary injunction was wrongfully issued.

*58. The Temporary Restraining Order is EXTINGUISHED and the Court DENIES the preliminary injunction.*

Dated: June 17, 2008          Respectfully submitted,

**WINSTON & STRAWN LLP**


By:  /s/ Gail J. Standish
    Gail J. Standish (State Bar No. 166334)
    E-mail: gstandish@winston.com
    Peter E. Perkowski (State Bar No. 199491)
    E-mail: pperkowski@winston.com
    **WINSTON & STRAWN LLP**
    333 South Grand Avenue, 38th Floor
    Los Angeles, California 90071-1543
    Telephone: 213-615-1700
    Facsimile: 213-615-1750

    Steven Lieberman (admitted *pro hac vice*)
    Minaksi Bhatt (SBN 151312)
    Lisa N. Phillips (admitted *pro hac vice*)
    **ROTHWELL, FIGG, ERNST & MANBECK**
    1425 K Street, N.W.
    Washington, D.C. 20005
    Telephone: 202-783-6040
    Facsimile: 202-783-6031

    Attorneys for Intervenor Defendant
    Spear Pharmaceuticals, Inc.

1501911_1

*Dated: June 18, 2008*

*United States District Court*

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW