UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE ANDREW J. GUILFORD, JUDGE PRESIDING; COURTROOM 10D

---

# CERTIFIED TRANSCRIPT

|                              |     |                          |
| ---------------------------- | --- | ------------------------ |
| Valeant Pharmaceutical International, | )   |                          |
|                              | )   |                          |
|                              | )   |                          |
|                              | )   |                          |
| Plaintiff(s),                | )   |                          |
|                              | )   |                          |
|                              | )   |                          |
|                              | )   | No. SACV 08-0449-AG(AGRx) |
| vs.                          | )   |                          |
|                              | )   |                          |
|                              | )   |                          |
|                              | )   |                          |
| Michael O. Leavitt, etc., et al., | )   |                          |
|                              | )   |                          |
|                              | )   |                          |
|                              | )   |                          |
| Defendant(s).                | )   |                          |
|                              | )   |                          |
| _____ | )   |                          |

REPORTER'S DAILY TRANSCRIPT OF PRETRIAL PROCEEDINGS
SANTA ANA, CALIFORNIA
MONDAY, SEPTEMBER 14, 2009

DENISE PADDOCK
CSR 10199, RPR, RMR, CRR
transcripts@ocrecord.com
U.S. DISTRICT COURT REPORTER

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF:**      **Jeffrey B. Valle**
                                     **Thomas P. Friedman**
                                     VALLE & ASSOCIATES
                                     11911 San Vicente Bl., Suite 324
                                     Los Angeles, CA  90036
                                     310-476-0300
                                     Fax: 310-476-0333
                                     Emails:
                                     jvalle@valleassociates.com
                                     tfriedman@valleassociates.com

**IN BEHALF OF THE DEFENDANT:**      **Gerald C. Kell**
                                     US Department of Justice
                                     Office of Consumer Litigation
                                     1331 Pennsylvania Avenue NW
                                     Suite 950N
                                     Washington, D.C. 20004
                                     202-514-1586
                                     Email: gerald.kell@usdoj.gov

                                     **Gail J. Standish**
                                     WINSTON & STRAWN LLP
                                     333 So. Grand Avenue, 38th Floor
                                     Los Angeles, CA  90071-1543
                                     213-615-1700
                                     Fax: 213-615-1750
                                     Email: gstandish@winston.com

                                     **Steven Lieberman, Pro Hac Vice**
                                     ROTHWELL, FIGG, ERNST & MANBECK PC
                                     1425 K Street, N.W.
                                     Washington, D.C. 20005
                                     202-783-6040
                                     Fax: 202-783-6031
                                     Email: slieberman@rfem.com

```
 1          SANTA ANA, CALIFORNIA; MONDAY, SEPTEMBER 14, 2009

 2          THE CLERK:  Item 9, SACV 08-0449-AG(AGRx):

 3   Valeant Pharmaceuticals International versus Michael O.

 4   Leavitt, et al.

 5          MR. VALLE:  Good morning, Your Honor.

 6          Jeffrey Valle and Tom Friedman for the plaintiff,

 7   Valeant Pharmaceuticals.

 8          MR. KELL:  Good morning, Your Honor.

 9          Gerald Kell from the Department of Justice for the

10   federal defendant.

11          MR. LIEBERMAN:  Good morning, Your Honor.

12          Steve Lieberman for intervener and defendant

13   Spear Pharmaceuticals.

14          MS. STANDISH:  Good morning, Your Honor.

15          Gail Standish, also on behalf of Spear

16   Pharmaceuticals.

17          THE COURT:  All right.  Well, we issued our

18   tentative.  I assume everyone received the tentative.  I

19   think it is in order that we hear from Valeant.

20          Now, state your name again.  We had quite a few

21   names there.

22          MR. VALLE:  Yes.  Jeffrey Valle, Your Honor.

23          THE COURT:  Yes.  Mr. Valle.

24          Obviously this case was highly front loaded at the

25   injunction stage, and I know you'll recall all the briefing
```

UNITED STATES DISTRICT COURT

 1    and counter briefing and actions by the government and

 2    withdrawals by the government and reassertions by the

 3    government.  And it was a close case at that time, and we

 4    made our ruling on the injunction.

10:27  5            My question for you now is what has changed?

 6            Your answer might be, Your Honor, you didn't give

 7    us the additional documents to show us what has changed, but

 8    that was the court's ruling.

 9            So based on the documents you have, what has

10:27 10    changed?

11            MR. VALLE:  Well, it -- Your Honor did comment that

12    it was a close case and obviously granted the temporary

13    restraining order and denied the preliminary injunction.

14            THE COURT:  But, you know, the temporary

10:27 15    restraining order was, as I recall, tied up in stipulations,

16    et cetera.  I don't -- that's -- I could be wrong, but that

17    temporary restraining order may have been based on a

18    stipulation.

19            MR. VALLE:  I think -- I think there were many

10:28 20    issues.

21            In our view, there is -- while there are many

22    issues, there is kind of a fundamental point, and I think

23    your tentative highlights that issue, and that is the

24    distinction between the authorized decision maker and the

10:28 25    relevant experts.

UNITED STATES DISTRICT COURT

3

1          THE COURT:  Absolutely.

2          MR. VALLE:  That, I think, is key.  There is no

3     doubt that the Office of Generic Drugs is the authorized

4     decision maker, but here the point we've tried to make, and

10:28 5     I think the record fully establishes, is that in this case,

6     dealing with a topical cream, a need for a clinical study and

7     skin disorders, including cancer, the expertise to opine

8     about that -- the right clinical study is with the Department

9     of Dermatology, as the OGD itself recognized.  And for seven

10:28 10     solid years it was the unanimous, consistent view of the

11     experts who know this.  There really wasn't --

12          THE COURT:  Let me just ask:  You find that issue

13     to be the key issue?

14          MR. VALLE:  Well, there's two issues.  One is the

10:29 15     Dr. Wilkins' tank, and the first is the relevant experts.

16          THE COURT:  All right.  Now, weren't those issues

17     fully addressed when we ruled on the injunction?

18          MR. VALLE:  Well, they were addressed, but as --

19     I mean --

10:29 20          THE COURT:  So, again, I'll go back to my first

21     question.

22          What's new that should make me change my mind?

23          MR. VALLE:  I think you were wrong at the

24     preliminary injunction stage, with all due respect.  And

10:29 25     that's not a final determination.  And upon reflection and

UNITED STATES DISTRICT COURT

1    consideration, if I can persuade you about the difference

2    between the decision maker and the experts, and it's the

3    correct decision, the final decision on this very, very

4    important matter should be the correct one, even if --

10:29  5         THE COURT:  All right.  Fair argument.

6         And no need to give me due respect.  A statement

7    usually followed by a disagreement with the court's ruling,

8    which is what we're all about here, folks.

9         MR. VALLE:  Yes.  Well, I began with the

10:29 10   disagreement.

11        THE COURT:  I understand.

12        And we're here to get it right.  I'm here to get it

13   right.  So I guess, again, my question is are you rearguing

14   what was previously argued?  Which is your prerogative.  It's

10:30 15   a different standard, for heaven's sake.  Summary judgment is

16   different than injunction.

17        I just want to make sure if I'm getting new

18   arguments or, more importantly, new facts.  And I'm hearing

19   no.  I'm hearing, based on what was presented to you before

10:30 20   you made the wrong decision, and now you're going to help me

21   make the right decision.

22        MR. VALLE:  I think that's correct.

23        THE COURT:  All right.  Understood.

24        MR. VALLE:  So the issue is who are the relevant

10:30 25   experts, not who is the authorized decision maker.  And the

UNITED STATES DISTRICT COURT

1    dermatology group is clearly the relevant experts.

2         What the Office of Generic Drugs does typically is

3    they have statisticians, they have some doctors, but they

4    don't have specialized doctors.  They typically determine

10:30  5    absorption rates of a drug in the bloodstream or in the

6    urine.  They take statistical analysis, and if it enters

7    within an hour, it's equivalent to the prior drug.  This is

8    a whole different ball game.  This is a topical skin cream

9    requiring a clinical study.

10:31  10         And as your tentative recognizes, when the OGD

11    doesn't have the expertise to address that, it's required to

12    go to the place in the FDA that has the expertise, which it

13    did, and that's the Department of Dermatology.

14         We have a seven-year history of the Department of

10:31  15    Dermatology, unwavering, saying to the Office of Generic

16    Drugs over and over again, you must test for cancer.  The AK

17    test will not effectively satisfy the cancer question.  The

18    OGD disregarded that.  It's not a debate amongst experts.

19    That's the fundamental flaw.  It's disregarding the relevant

10:31  20    experts as they, themselves, recognized, and as common sense

21    tells us and as the regulations tells us, by going out to

22    those experts.

23         Now, each case is specific, and had there been

24    disagreement within the Department of Dermatology, I can

10:32  25    understand that the OGD might have to make some resolution of

1   some dispute within the experts, but there never was any

2   disagreement.

3        And then, oddly, the decisional memorandum was

4   written by Dr. Beitz, who is not in the OGD.  She's not

10:32  5   within the authorized decision maker, and --

6        THE COURT:  Oddly or tellingly?

7        MR. VALLE:  Well, tellingly to us.

8        THE COURT:  All right.

9        MR. VALLE:  As you know, it dovetails into this.

10:32 10       THE COURT:  And in the circumstances that kind of

11   made -- that's one of the things that made this a close case.

12       MR. VALLE:  And obviously this dovetails into the

13   second issue.  They're not unrelated because Dr. Beitz

14   rendered that opinion after Dr. Wilkins submitted his

10:32 15   submission on behalf of Spears, which he shouldn't have done,

16   and which was inconsistent with his view when he was with the

17   FDA, and Dr. Beitz turned around her position.

18       That -- I mean, this is -- contrary to what the FDA

19   and Spears argue, this is not a ruling that this was not the

10:33 20   proper procedure.  It hardly turns the FDA upside down.  It

21   merely holds them accountable to follow their own rules and

22   procedures in a case I think everyone will admit, and one of

23   the reasons I think Your Honor recognizes it's close is this

24   is fraught with issues.

10:33 25       Disregarding the relevant experts for seven years,

UNITED STATES DISTRICT COURT

1    having an outside former director of the FDA come in and

2    submit an opinion that is then relied upon by someone outside

3    the scope of the matter, rendering a -- turning around her

4    own view, rejecting the dermatology.

10:33  5            And -- and the other issue that I think is relevant

6    is under their own rules and regulations, if a supervisor

7    disagrees with recommendations, she is required to create a

8    memorandum, deliver that -- as we put in our brief, deliver

9    that to the original decision maker here, the DDDP.  She

10:34 10   didn't do that.

11           THE COURT:  Tell me what you acknowledge, concede,

12   or argue is my standard for reviewing the actions below.

13           MR. VALLE:  Well, the first question is did the FDA

14   ignore its experts?  If it didn't, if it took its experts

10:34 15   into consideration and there was a debate among the relevant

16   experts, there is a deference.  If it did not, as we argue in

17   this case, if it ignored and really secluded its experts

18   completely from the reconsideration process, in that case

19   then your -- then there's no deference to the agency

10:34 20   expertise because they've ignored it themselves.

21           And then the question is did they make a rational

22   or an arbitrary decision.  And here they made an arbitrary

23   decision directly inconsistent with their own experts.  That

24   is, I think, the standard that should apply.  And in this

10:35 25   very, very important case, the court has a whole --

8

|  |  |
|---|---|
| 1 | THE COURT:  Very, very important? |
| 2 | In 25 words or less, tell me why it's very, very |
| 3 | important.  I can think of three possible ways you might go, |
| 4 | and I'd be interested in which way you're going. |
| 10:35 5 | MR. VALLE:  Well, there's several ways, but we're |
| 6 | dealing with skin cancer.  This is a drug that is on the |
| 7 | market to say this will treat skin cancer. |
| 8 | THE COURT:  It's important because if it says it |
| 9 | will treat skin cancer, it needs to treat skin cancer. |
| 10:35 10 | MR. VALLE:  Yes. |
| 11 | THE COURT:  All right. |
| 12 | MR. VALLE:  I mean, it's a complicated issue |
| 13 | involving any -- |
| 14 | THE COURT:  Any other points that make it |
| 10:35 15 | important? |
| 16 | By the way, it's -- |
| 17 | MR. VALLE:  I wouldn't -- obviously there's |
| 18 | competitive issues between the parties here, but that's not |
| 19 | really what's before the court. |
| 10:35 20 | THE COURT:  Okay. |
| 21 | MR. VALLE:  What's before the court is did the FDA |
| 22 | fail to properly put this generic drug on the market? |
| 23 | THE COURT:  Well, another policy argument, of |
| 24 | course, before the court is how much should district courts |
| 10:36 25 | be a watch dog for a government agency? |

UNITED STATES DISTRICT COURT

```
 1              MR. VALLE:  Yes.
 2              THE COURT:  And in the process would -- is it
 3    possible in the future we could delay the distribution of
 4    a life-saving drug at a lower cost perhaps, which is an
10:36 5    aspect of this case?  That's another thing to think about,
 6    which is why the standard of deference is pretty high.  And
 7    these are the things the court's been thinking about since
 8    you filed this case in 2008.
 9              MR. VALLE:  Yes.  Well -- and the deference is an
10:36 10   important part of the policy, but that's only part the
11    policy.
12              If there isn't a corresponding gate-keeping role of
13    the federal court, then no one's doing it.  If the FDA gets
14    to do whatever it wants --
10:36 15             THE COURT:  Ah, that's a great argument, yes.
16              All right.  Anything more before we turn to the
17    defense?
18              MR. VALLE:  Just very briefly on the Dr. Wilkins
19    issue.
10:37 20             THE COURT:  Yes.
21              MR. VALLE:  I think they do dovetail.
22              THE COURT:  Of course they dovetail.  That's why
23    this court's struggling with this case.
24              MR. VALLE:  The other thing that is odd or telling
10:37 25   or significant is upon realizing and admitting that they need
```

UNITED STATES DISTRICT COURT

1    to make a determination without the influence of Dr. Wilkins,

2    they go right back to Dr. Beitz.  Dr. Beitz, who is not in

3    the Office of Generic Drugs, Dr. Beitz who is clearly

4    tainted, that's where they go.

10:37  5        And she then uses Dr. Wilkins' arguments to find

6    support.  Whether it's in prior memoranda in the FDA or in

7    the literature, it doesn't really matter.  She's using his

8    arguments without his name.

9        And then Dr. Throckmorton does the same thing.  He

10:37 10  cites over and over again Dr. Beitz' earlier memorandum that

11   was influenced by Dr. Wilkins, even saying that memorandum

12   elegantly summarizes the arguments and issues.  They do this

13   very quickly and -- you know, we cited the *Gayer versus*

14   *Schlesinger* case about -- in that case it was remanding back

10:38 15  for a determination.

16        The court that said you need to have different

17   decision makers, and part of the argument was if you go back

18   to the same decision maker, even if they acted in good

19   faith -- and I have a block quote on this.  Even if they

10:38 20  acted in good faith, the problem is they have to rid

21   themselves of their decision that they've committed

22   themselves to, and that's the problem -- and this is where

23   the court has expertise.

24        We're not asking this court to weigh in on the

10:38 25  science at all.  The dermatologists are the experts in that.

1    But procedurally and following their own procedures and

2    issues of conflict resolution, that's squarely within their

3    expertise.

4          THE COURT:  Issues of conflict resolution.

10:38  5          That's a good point to turn to your opponents.

6          What have you to say on this matter?

7          MR. KELL:  Good morning, Your Honor.

8          I'm Gerald Kell, and I'm from the Justice

9    Department on behalf of the government, particularly FDA.

10:39  10   And Wendy Vicente, who is with the Office of Chief Counsel of

11    FDA is also here with me.

12          I should say first that I'm not Andrew Clark, who

13    appeared before Your Honor on the preliminary injunction.

14    Mr. Clark remains the lead counsel for the government on this

10:39  15   case, but he simply had responsibilities that made it

16    impossible for him to be here today, and we certainly didn't

17    want to delay the case because of that.  We may have decided

18    that a delay would have been beneficial if Your Honor's

19    tentative ruling had gone the other way, but it didn't; so

10:39  20   we're -- we're happy to be here today.

21          I'm going to -- I'm going to indulge myself for a

22    moment, Your Honor, and I'm going to pretend that I have the

23    right to ask you a question.  And the question would be

24    suppose at the end of this -- this hearing on summary

10:40  25   judgment Your Honor issues a decision and that decision

turns, because you say so, in part on something that was

presented to you, let's say, by the government and Valeant

appeals.

        And the Ninth Circuit says, Judge, you shouldn't

have considered that item that you relied on that was

presented by the government.  We remand the case to you.

        Does Your Honor have to step aside and say, well,

I'm somehow irretrievably tainted?  Is Your Honor unable to

say, all right.  I'll put that aside and I'll look at what

was presented by the government in summary judgment.  And I

look at that and I've considered all those things, as well as

the things that the Ninth Circuit told me I should haven't

considered, and looking at those things apart I find my

decision would be the same -- is the same; summary judgment

granted.

        Now, I'd think that was a clever argument by me if

I had invented it, but I didn't.  It's the *Morgan* case from

the 1940s that we cite in our briefs.  We cited it at the

preliminary injunction stage.

        THE COURT:  Well, hold on.  Let me think this

through.

        Is the question you're presenting to me rhetorical

or is it a setup for the *Morgan* case?

        MR. KELL:  It is both a rhetorical question, what

would Your Honor do --

1          THE COURT:  All right.  And so you want me to say

2     I took an oath to follow the law, and I will consider new

3     information presented by the Ninth Circuit.  I do it all the

4     time -- as you know, Judges do that all the time -- and it is

10:41 5     the -- it's just an aspect of our job, and I take my oath

6     seriously.

7          So your point is you take your responsibilities

8     seriously too and you've processed this in good faith; right?

9          MR. KELL:  More than that, Your Honor.  More than

10:42 10     that.

11          Your Honor would be presumed to be following your

12     oath and acting in your judicial role on that remand, and the

13     Supreme Court's also said in *Overton Park*, among other cases

14     that we cite, that decision makers -- agency decision makers

10:42 15     are entitled to the same kind of presumption of regularity.

16          THE COURT:  You folks didn't take an oath.

17          MR. KELL:  Well, in fact, they do take an oath, but

18     that's -- that's beside the point, Your Honor.

19          The point is the Supreme Court has analogized and

10:42 20     said, in these words, there is a presumption of regularity to

21     agency proceedings and that presumption comes forward to the

22     court when the agency certifies the administrative record,

23     and the court is not to presume that there was some nefarious

24     motive or some inability by the decision maker to do what the

10:43 25     decision maker says it did.

1    THE COURT:  Let me tell you, though, the problem

2    with presenting a metaphor or an analogy, as you've somewhat

3    done here, is then we start spinning off on that.  When the

4    Ninth Circuit sends it back to me and I purport to apply the

10:43 5    new direction they've given me, that decision gets appealed

6    to the Ninth Circuit, and they look at the record and see if

7    the facts support it, and that's what we're doing here right

8    now.

9    MR. KELL:  Absolutely, Your Honor.  We're -- you're

10:43 10   now the Ninth Circuit --

11   THE COURT:  Thank you.

12   MR. KELL:  -- the FDA is back before you, and --

13   and you're looking at the record to see what FDA did.  And

14   you are to presume that the agency acted regularly in

10:43 15   accordance with its proper procedures, as it says it did.

16   You are to presume that Dr. Beitz excluded what Dr. Wilkins

17   had submitted and said, "I've looked back at what I did

18   before, and here are the things that were before me without

19   his decision, and that I relied on without his decision."

10:44 20   And Dr. Throckmorton looks at Dr. Beitz' conclusion

21   and says, "That's right.  And I'm looking at it

22   independently, and I find all these other things absent the

23   submission from Dr. Wilkins that support the correctness in

24   the agency's view, the correctness of the decision to rely

10:44 25   upon the one clinical trial in the actinic keratosis setting.

1          And then Dr. Throckmorton is further reviewed by

2     the Director of the Center for Drug Evaluation and Research,

3     and she's further reviewed by the commissioner of the FDA.

4          I --

10:44  5          THE COURT:  Should I take comfort in the candid

6     initial concern of the agency to revisit this issue when the

7     case was first filed?  Should I take comfort in that or

8     concern in that?

9          MR. KELL:  You should take great comfort in it,

10:45 10     Your Honor, because I don't know that that potential

11     appearance of impropriety -- and that's what it was, a

12     potential appearance of impropriety -- that that would ever

13     have come to anyone's attention had not the agency

14     forthrightly said, "Whoops, Dr. Beitz didn't know this at the

10:45 15     time, but we now see that there is a potential appearance of

16     impropriety here."

17          And we want to look at it again, and we come to the

18     court and we ask the court to let us do it again and to hold

19     everything in place until we've had an opportunity to do

10:45 20     that, and then we do it, and we present the record of that to

21     the court.  And we're entitled to be viewed not with

22     skepticism and mistrust, Your Honor -- you shouldn't take

23     discomfort; you should take comfort from what the agency did.

24          THE COURT:  All right.  Looking at a broader policy

10:46 25     concern, should district courts be more concerned about

|    |                                                                           |
|----|---------------------------------------------------------------------------|
| 1  | putting additional checks and controls on the FDA, thereby                |
| 2  | slowing their decision-making process, or deferring to the                |
| 3  | FDA in good faith, thereby certainly not slowing the review               |
| 4  | process?                                                                  |
| 10:46  5 | MR. KELL:  Well, the Supreme Court said in *Vermont* |
| 6  | *Yankee* and other cases that the court is not to engraft its             |
| 7  | own view of what proper procedures are.  If the agency's                  |
| 8  | procedures are sufficient to pass constitutional muster, and             |
| 9  | I see no constitutional claim asserted here, then the court              |
| 10:46 10 | shouldn't impose other restraints, other conditions, other |
| 11 | procedures on the agency, which while the court might like                |
| 12 | them -- and maybe if we took a vote among the populace, the              |
| 13 | populace might like them -- the agency gets to decide those              |
| 14 | things.                                                                   |
| 10:47 15 | I've heard this figure thrown about my entire |
| 16 | career doing this, Your Honor, and that's been about                      |
| 17 | 30 years, that the FDA regulates approximately 25 percent of             |
| 18 | the gross national product of the United States.  It does it              |
| 19 | with a relative, to that responsibility, small cadre of                   |
| 10:47 20 | dedicated public servants. |
| 21 | And I must tell Your Honor that I -- it disturbs me                       |
| 22 | the number of times that I've had to come into courts around            |
| 23 | this country and argue to courts that these people are not                |
| 24 | engaged in some kind of skulduggery to the detriment of                   |
| 10:47 25 | whoever happens to be the plaintiff. |

UNITED STATES DISTRICT COURT

1        And I also must say to Your Honor, the plaintiff is

2   just as often the generic drug manufacturer as it is the name

3   brand.

4        These people do their work.  They do it

10:48  5   responsibly.  Your Honor has a record before you that shows

6   the responsibility of this agency in this case.  I submit to

7   the court that Your Honor's tentative ruling is absolutely

8   correct.  And while I realize in the posture of this case at

9   the preliminary injunction phase there were causes for

10:48 10   concern, I believe those have been obliterated, to use a weak

11   word, Your Honor.

12        THE COURT:  All right.  Mr. Dell [sic.], I

13   appreciate your defense of your agency.

14        Another answer to my question might have been,

10:48 15   Your Honor, further controls can delay the process, and delay

16   can cause fatal results amongst the American population, as

17   well as excessively quick action.  I probably didn't say that

18   as eloquently as I intended.

19        Excessive controls and procedures can produce

10:49 20   delay, which can also harm the health of Americans.

21        MR. KELL:  I like your answer, Your Honor, but I'd

22   like to go a little further than that.  I'd like to say that

23   every time FDA makes a decision on a matter like this,

24   whether to approve or not approve a drug that's going to be

10:49 25   distributed and used by the American people, that's always an

```
 1   issue.  Here it's maybe more sensitive because it's cancer,
 2   but FDA knows that that's its responsibility.
 3           FDA is not looking for a pass or an easy way to do
 4   these things.  FDA has procedures in place and followed them
 5   here, Your Honor.
 6           THE COURT:  I understand your argument.
 7           All right.  Anything else from this side?
 8           MR. LIEBERMAN:  Yes, Your Honor.
 9           THE COURT:  It's got to be brief now.
10           MR. LIEBERMAN:  It will be.
11           THE COURT:  I think your position was actually very
12   well presented by Mr. Dell [sic.].
13           MR. LIEBERMAN:  Thank you.
14           Or thank Mr. Kell.
15           THE COURT:  I'm sorry.  Was it Kell?
16           MR. KELL:  Yes, Kell.
17           THE COURT:  I had Dell.  I'm sorry.
18           MR. LIEBERMAN:  Your Honor, Steve Lieberman for
19   Spear Pharmaceuticals.
20           And Mr. Valle's first point, two things that he
21   said in his presentation are very telling, and I think it
22   leads, along with one or two record cites, to a fairly simple
23   answer to the question.
24           He said, No. 1, no doubt OGD is the authorized
25   decision maker; and, No. 2, he said the first question is did
```

the FDA ignore its experts?

At Page A655 of the transcript, the joint appendix, you have this statement from Dena Hixon, who is at OGD:

"The proceeding discussions include the reasons why OGD disagrees with DDDP's conclusions with regard to the suitability of a single bioequivalent study."

That same sort of statement appears at A735, where Dr. Beitz discussed Markham Luke's September 5th, 2006, memorandum, and explains in detail why she disagrees.

The same recognition and discussion of the DDT -- DDDP position occurs at Pages A194 -- 1094 through 95 in the Throckmorton memorandum, and the fact that DDDP is only providing a consulting view and that they are not the decision maker is something that is recognized in the DDDP memos themselves.

So, for example, if you were to look at --

THE COURT:  Well, you know, I've looked at these record cites --

MR. LIEBERMAN:  Okay.

THE COURT:  -- and additional time I give to you is time I'm taking away from Matters 26, 25, and 24.

Can you wrap it up?

MR. LIEBERMAN:  I can.

On the second point, Your Honor, about the -- your

1    question and the question about Wilkins, Your Honor has gone

2    through in your tentative ruling on Pages 5 and 6 a detailed

3    analysis of Dr. Beitz' bases for concluding that she would

4    have ruled the same way.

10:52  5         Mr. Valle has not attacked that at all in his

6    papers.  That reasoning -- and those are the same arguments

7    that we had made to the court.  It's very clear that

8    Dr. Beitz provided a reasoned basis for why she was

9    concluding that she disagreed with -- why she would have

10:52 10   ruled the same way.

11         There is a Ninth Circuit decision, Your Honor,

12   directly on point to the question Your Honor had asked.

13   Your Honor asked about involving yourself in agency decisions

14   and what the effect of that would be.  Here the agency has

10:52 15   come up with a way for dealing with potential perceived

16   conflicts of interest.  It put in place a procedure.

17         The Ninth Circuit in *Lands Council versus McNair*

18   made very clear that a court may not impose procedural court

19   requirements not specifically enumerated in the pertinent

10:53 20   statutes.

21         What Valeant is asking you to do is to come up with

22   your own procedure for reviewing these issues.

23         Your Honor, there are two transcription areas in

24   the transcript ruling on cites to the joint appendix.  I can

10:53 25   give you those if that would be useful.

```
 1                THE COURT:  All right.  Got to make it quick.

 2                You probably should have led with that, but go

 3       ahead.

 4                MR. LIEBERMAN:  Page 2, Line 28, you cite AR 994.

10:53  5       It should be AR 947.

 6                And Page 2, Line 10, AR 993 should be AR 939.

 7                Your Honor, the -- the last point is simply with

 8       Your Honor's tentative ruling standing, Your Honor knows that

 9       there is a million dollar bond out there.  We're going to --

10:54 10       Your Honor --

11                THE COURT:  Finish your statement.

12                MR. LIEBERMAN:  That we had moved in 2008 for

13       execution on the bond.  Your Honor held that that was

14       premature and that at the end of the case we should --

10:54 15                THE COURT:  And therefore?

16                MR. LIEBERMAN:  We will be doing that, Your Honor.

17                THE COURT:  You're telling me what's going to

18       happen.  I'll look forward to that.

19                MR. LIEBERMAN:  Thank you, Your Honor.

10:54 20                THE COURT:  All right.  Mr. Valle for Valeant.

21                MR. VALLE:  Thank you, Your Honor.

22                THE COURT:  Quickly.  We've spent a lot of time on

23       this and --

24                MR. VALLE:  I'll be very, very quick.

10:54 25                The FDA's argument, which they're used to making --
```

1    but it has to be understood as if the authorized decision

2    maker made the decision, that's correct; it should be

3    presumed to be correct.  They leave no other possibility.

4                THE COURT:  That is true.  It proves too much.

10:54  5                MR. VALLE:  It proves way too much.

6                And we are not trying to change rules and we're not

7    trying to impose any measures.  We're saying, and we have

8    case law to support it, in cases where the authorized

9    decision maker was reversed by the court because they did

10:54  10   not -- they ignored the relevant experts.

11               And I agree there was a dispute between the

12   dermatologists and the OGD, but they are the relevant

13   experts.  That's my point, and I don't think it was refuted.

14               As to the conflict of interest issue, again, we're

10:55  15   not asking that any procedures be imposed but, rather, first

16   of all, the FDA doesn't -- apparently doesn't have procedures

17   for dealing with this situation, and they handed it back to

18   the person who was tainted, and that person relied again on

19   the tainted person.

10:55  20               THE COURT:  Okay.  Plaintiff Valeant, I think that

21   was a good argument for you to close.  That wasn't an

22   argument that I was thinking of as they were making their

23   arguments.

24               I'm going to take the matter under submission.  We

10:55  25   are going to get a ruling out shortly.

UNITED STATES DISTRICT COURT

```
 1              Thank you, Counsel.

 2              MR. VALLE:  Thank you.

 3              MR. KELL:  Thank you, Your Honor.

 4              (End of proceedings.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```