**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE ANDREW J. GUILFORD, JUDGE PRESIDING**

- - - - - - -

```
VALEANT PHARMACEUTICALS      )
INTERNATIONAL,               )
                             )
          Plaintiff,         )
                             )
     vs.                     ) No. SACV 08-0449 AG
                             )    Item No. 15
SPEAR PHARMACEUTICALS,       )
                             )
          Defendant.         )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Hearing on Motions

Santa Ana, California

Monday, November 2, 2009


Debbie Gale, CSR 9472, RPR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-8141

08CV0449 Valeant 2009-11-02 Item 15

```
 1   APPEARANCES OF COUNSEL:

 2

     FOR THE PLAINTIFF VALEANT PHARMACEUTICALS INTERNATIONAL:
 3
             VALLE & ASSOCIATES
 4           BY:  JEFFREY B. VALLE
                  Attorney at Law
 5           11911 San Vicente Boulevarde
             Suite 324
 6           Los Angeles, California 90049
             (310) 476-0300
 7

 8   FOR THE DEFENDANT SPEAR PHARMACEUTICALS:

 9           WINSTON & STRAWN LLP
             BY:  GAIL J. STANDISH
10                Attorney at Law
             333 South Grand Avenue
11           38th Floor
             Los Angeles, California 90071
12           (213) 615-1731

13         -AND-

14           ROTHWELL FIGG, ERNST & MANBECK, PC
             BY:  Steven Lieberman
15                Attorney at Law
             1425 K Street NW
16           Suite 800
             Washington DC 20005
17           (202) 783-6040

18

19

20

21

22

23

24

25
```

Case 8:08-cv-00449-AG-AGR   Document 253   Filed 03/24/10   Page 3 of 18   Page ID #:3311
SACV 08-0449 AG - 11/2/2009 - Item No. 15

3

| | | |
|---|---|---|
| 1 | **I N D E X** | |
| 2 | **PROCEEDINGS** | **PAGE** |
| 3 | Motion for execution on bond | 4 |

| | |
|---|---|
| | 1    **SANTA ANA, CALIFORNIA, MONDAY, NOVEMBER 2, 2009** |
| | 2                          **Item No. 15** |
| | 3                           (10:40 a.m.) |
| 10:40 | 4         THE CLERK:  Item 15, SACV 08-449, Valeant |
| 10:40 | 5    Pharmaceuticals International v. Spear Pharmaceuticals. |
| 10:41 | 6         MS. STANDISH:  Good morning, Your Honor.  Gail |
| 10:41 | 7    Standish on behalf of Defendant Spear. |
| 10:41 | 8         MR. LIEBERMAN:  Steven Lieberman on behalf of |
| 10:41 | 9    Defendant Spear. |
| 10:41 | 10        MR. VALLE:  Jeffrey Valle on behalf of the |
| 10:41 | 11   plaintiff, Valeant Pharmaceuticals. |
| 10:41 | 12        THE COURT:  All right.  Let's begin with |
| 10:41 | 13   Mr. Valle.  You received our tentative? |
| 10:41 | 14        MR. VALLE:  I have, Your Honor.  And I have one |
| 10:41 | 15   issue to raise with it.  I believe there's a mitigation |
| 10:41 | 16   point that needs to be added to the calculation, assuming |
| 10:41 | 17   the calculation that Your Honor did. |
| 10:41 | 18        THE COURT:  All right.  Is that the $125,000 |
| 10:41 | 19   issue? |
| 10:41 | 20        MR. VALLE:  Yes, it is. |
| 10:41 | 21        THE COURT:  I think you may be rewarded for this |
| 10:41 | 22   argument.  Go ahead. |
| 10:41 | 23        MR. VALLE:  Well, as your tentative recognizes, |
| 10:41 | 24   Spear's expert, in each of his three calculations, |
| 10:41 | 25   recognized that as soon as the TRO was lifted, the sales |

| | | |
|---|---|---|
| 10:42 | 1 | recaptured the $782,000 that -- of unfilled orders from the |
| 10:42 | 2 | period April 30 to June 1, the voluntary stay, but did not |
| 10:42 | 3 | take into account the $125,000 of unfilled orders during the |
| 10:42 | 4 | TRO period.  And your tentative acknowledges that at page 8, |
| 10:42 | 5 | that Mr. Weinstein's total did not take this into account. |
| 10:42 | 6 | You then proceed to eliminate the first atypical |
| 10:42 | 7 | day, which makes sense; but that doesn't take away from the |
| 10:42 | 8 | actual mitigation.  Clearly, if unfilled orders -- |
| 10:42 | 9 | THE COURT:  I understand the argument. |
| 10:42 | 10 | MR. VALLE:  And so we would suggest that that |
| 10:42 | 11 | 125,500, I think it is, needs to be subtracted from the |
| 10:42 | 12 | total before applying the profit margin or the -- |
| 10:43 | 13 | THE COURT:  I do think that's a winner for you. |
| 10:43 | 14 | Move on to any other points you may have. |
| 10:43 | 15 | I have a question for you.  If the average daily |
| 10:43 | 16 | sales is not a good estimate of loss, then what is? |
| 10:43 | 17 | MR. VALLE:  Well, one point I would make is we |
| 10:43 | 18 | didn't attack the expertise of Mr. Weinstein.  He has a very |
| 10:43 | 19 | long resume.  What we claimed is he didn't apply any |
| 10:43 | 20 | expertise.  He took a mathematical average over a one-year |
| 10:43 | 21 | period that included kind of apples and oranges, as we've |
| 10:43 | 22 | described. |
| 10:43 | 23 | The burden is to show within reasonable certainty |
| 10:43 | 24 | actual losses.  The unfilled orders is the evidence that |
| 10:43 | 25 | establishes actual losses, because those are actual orders |

10:43  1  that were not filled.  Of course, those, we believe, were
10:43  2  fully litigated.
10:43  3           We made the argument -- I understand that
10:43  4  Your Honor has not accepted it -- but I think the showing
10:44  5  that Spear has made -- and it is their burden -- is
10:44  6  extremely thin, without any explanation for the
10:44  7  methodologies that were offered or -- or any basis for
10:44  8  concluding that they are reliable.
10:44  9           I agree that if you're going to use any of them,
10:44  10 something that takes it at least close in time to the TRO
10:44  11 period makes sense.  But the only actual evidence of loss is
10:44  12 the unfilled orders --
10:44  13           THE COURT:  Okay.
10:44  14           MR. VALLE:  -- and that was mitigated.
10:44  15           THE COURT:  I have one other question.  It's a
10:44  16 broader question.
10:44  17           If we were to enjoin a gas station from selling
10:44  18 gas, it's pretty clear they would lose sales to the gas
10:44  19 station across the street.  Right?  It's a fungible good.
10:44  20           MR. VALLE:  Yeah.  Or at least to some other gas
10:44  21 station.
10:44  22           THE COURT:  If we were to enjoin the sale of a
10:44  23 truly unique good that couldn't be gotten any other place,
10:44  24 those would tend to be lost sales, because they, obviously,
10:45  25 didn't go across the street to buy it.

10:45  1    What is this case?
10:45  2    MR. VALLE: Well, I think this case is not a
10:45  3    retail-level case, and that's the first distinction. That
10:45  4    is, the sales that are being made are being made to
10:45  5    retailers, and so there's a pipeline that's being filled.
10:45  6    And orders come in. Those orders, if they're not filled
10:45  7    immediately, don't go away necessarily.
10:45  8    THE COURT: That's what I'm asking.
10:45  9    MR. VALLE: Because they wouldn't go away until
10:45  10   the retailer has, in fact, lost their supply and has to go
10:45  11   elsewhere. And that's implicit, obviously, in the analysis
10:45  12   of Spear's own expert. That $782,000, going back over a
10:45  13   month, are not lost; those got filled. Because it's not
10:45  14   like the gas station; it's more like Exxon supplying to the
10:45  15   gas station. And the fact that it may not be able to fill
10:45  16   an order right away doesn't mean that the gas station has to
10:46  17   go elsewhere as long as the gas station has supplies.
10:46  18   There's no --
10:46  19   THE COURT: All right. Understood.
10:46  20   Let's hear from the defense, particularly as to
10:46  21   this 125.
10:46  22   MR. LIEBERMAN: Good morning, Your Honor. Steve
10:46  23   Lieberman for Spear.
10:46  24   THE COURT: Yes, Mr. Lieberman.
10:46  25   MR. LIEBERMAN: I'd like to address first just a

|  |  |  |
|---|---|---|
| 10:46 | 1 | number of typographical and computation corrections that I |
| 10:46 | 2 | think the Court might wish to make.  And I have an errata |
| 10:46 | 3 | sheet here and some backup documents on the corrections, if |
| 10:46 | 4 | I could hand it up to the Court. |
| 10:46 | 5 | THE COURT:  All right. |
| 10:46 | 6 | MR. LIEBERMAN:  First, Your Honor, on page 1, |
| 10:46 | 7 | line 12 of the order, the order is entitled "Order Granting |
| 10:46 | 8 | Valeant's Motion for Execution."  It should be "Order |
| 10:46 | 9 | Granting Spear's Motion for Execution." |
| 10:46 | 10 | THE COURT:  All right. |
| 10:46 | 11 | MR. LIEBERMAN:  On page 5, Your Honor, at line 10. |
| 10:46 | 12 | THE COURT:  I got it.  I see the errata. |
| 10:46 | 13 | MR. LIEBERMAN:  Same issue. |
| 10:47 | 14 | The third, Your Honor, is on page 8. |
| 10:47 | 15 | THE COURT:  I see the errata.  You don't have to |
| 10:47 | 16 | repeat it since I've got the errata. |
| 10:47 | 17 | MR. LIEBERMAN:  If I can provide the explanation |
| 10:47 | 18 | for the third and for the fourth, because they get into |
| 10:47 | 19 | computational issues? |
| 10:47 | 20 | THE COURT:  All right. |
| 10:47 | 21 | MR. LIEBERMAN:  On page 8, Your Honor had ruled |
| 10:47 | 22 | that the Court found the first sales day -- which was the |
| 10:47 | 23 | Thursday, June 19th -- to be anomalous.  And as a |
| 10:47 | 24 | consequence, it wasn't starting with that first day.  The |
| 10:47 | 25 | Court then skipped the Friday, the second day, and started |

|  |  |  |
|---|---|---|
| 10:47 | 1 | with the third business day, which is June 23rd.  Because |
| 10:47 | 2 | the Court held that the first day was anomalous and it |
| 10:47 | 3 | wasn't gonna include that, the computation should have |
| 10:47 | 4 | included, we submit -- started with the Friday, June 20th. |
| 10:47 | 5 | And if Your Honor looks at Attachment A, that has |
| 10:47 | 6 | the 13 days beginning with the second day, Friday.  And you |
| 10:48 | 7 | can see that the second day, June 20th, is not anomalous |
| 10:48 | 8 | because, among other things, it's less than the June 25th |
| 10:48 | 9 | sale day.  So if Your Honor were to do the calculations |
| 10:48 | 10 | according to the methodology that you set out, starting with |
| 10:48 | 11 | the second day rather than the third day, you would get the |
| 10:48 | 12 | $724,452 number. |
| 10:48 | 13 | And then we've included the interest and various |
| 10:48 | 14 | others things. |
| 10:48 | 15 | THE COURT:  All right.  I've got it. |
| 10:48 | 16 | MR. LIEBERMAN:  The Court also made an error in |
| 10:48 | 17 | Spear's favor, which I feel duty-bound to point out.  When |
| 10:48 | 18 | the Court added back the interest, the Court added the |
| 10:48 | 19 | interest to the lost sales rather than to the lost profits. |
| 10:48 | 20 | And that's set out in Item 4 on the errata sheet.  So you |
| 10:48 | 21 | actually gave us $40,000 more than we would actually be |
| 10:49 | 22 | entitled to. |
| 10:49 | 23 | What I'd like to do now is address your question |
| 10:49 | 24 | as to the 125,000, and also suggest briefly one minor |
| 10:49 | 25 | modification on the methodology, which flows from Your |

```
10:49   1    Honor's legal conclusions.
10:49   2              On the $125,000, you would be doing double
10:49   3    deducting if you took the $125,000 out.  That is, the
10:49   4    $125,000 was in as part of the first day of sales, that
10:49   5    Thursday, June 19th.  Because Your Honor did not include
10:49   6    that, we did not get any credit for the $125,000.  If you
10:49   7    then deduct it on the back end, you will have deducted the
10:49   8    $125,000 twice.
10:49   9              The minor modification, Your Honor, is in
10:49   10   Item 4-C.  All right?
10:49   11             THE COURT:  Just a moment.
10:49   12             MR. LIEBERMAN:  Yes, Your Honor.
10:49   13             THE COURT:  All right.
10:49   14             MR. LIEBERMAN:  Your Honor had concluded that the
10:49   15   first day of sales was anomalous.  I have a way of dealing
10:50   16   with that issue and dealing with the $125,000 at the same
10:50   17   time.  The way one would do that is to deduct from -- is to
10:50   18   deduct the $782,000, which Mr. Weinstein did -- that was the
10:50   19   sales during the voluntary stay period -- and deduct from
10:50   20   that first day of sales, in addition, the $125,000, which
10:50   21   was the accumulated unfilled orders.  Should you do that,
10:50   22   you would then get the calculations that are set forth in
10:50   23   4-C on the errata sheet.
10:50   24             And for the Court's convenience, we've provided
10:50   25   the precise days with those two changes on Attachment B.
```

And the total number there, Your Honor, would then be -- with interest added in, $904,415.  That would include the first day, deduct the 782, deduct the 125, which gets rid of the anomalous issue.

So we would submit that the correct calculation is 904,415.  And there, Your Honor, we've also fixed the issue with adding the interest back into the lost profits and lost sales.

THE COURT:  All right.  Any response from the plaintiff on this?

MR. VALLE:  Yes, Your Honor.

First of all, I don't think there's any double counting with the 125.  As I understand the expert's calculation, it was to determine the average daily sales that would have occurred during the 13-day period.  Once that's determined, if there has been mitigation of those sales, it must be reduced.  The fact that the anomalous sales when the TRO was lifted are not part of the calculation is wholly separate from the mitigation point.

That -- Spear received the money, received the mitigation.  It simply -- Your Honor is correct, I believe, that if you're gonna try to figure out what average sales would have been during that period, you need to remove atypical sales.  And I would -- I think that is very clear from both the expert's calculation and the logic of your

| | | |
|---|---|---|
| 10:52 | 1 | tentative. |
| 10:52 | 2 | There would be a double recovery if the TRO is |
| 10:52 | 3 | lifted -- and, I think now, as everyone acknowledges, they |
| 10:52 | 4 | filled their $125,000 of orders. They got the money. And |
| 10:52 | 5 | then to say, "Now let's calculate their average daily loss |
| 10:52 | 6 | during that period and give that to them without deducting |
| 10:52 | 7 | the 125,000," they've now received it twice. |
| 10:52 | 8 | THE COURT: All right. |
| 10:52 | 9 | What do you say to that, Mr. Lieberman? |
| 10:52 | 10 | MR. LIEBERMAN: I don't believe, Your Honor, that |
| 10:52 | 11 | that's correct. I think you're taking the 125,000 out |
| 10:53 | 12 | twice. |
| 10:53 | 13 | The way to deal with this, quite simply, though, |
| 10:53 | 14 | is to use the alternative methodology, which is -- I think, |
| 10:53 | 15 | it's 4-C, because that -- you know, that takes out the |
| 10:53 | 16 | 125,000 right from the get-go, counting day one. I think |
| 10:53 | 17 | that eliminates the problem. |
| 10:53 | 18 | THE COURT: All right. I'm going to have to go |
| 10:53 | 19 | through the papers again with the errata, and I'll take it |
| 10:53 | 20 | under submission and come up with a ruling. |
| 10:53 | 21 | Yes? |
| 10:53 | 22 | MR. VALLE: May I just respond to a couple other |
| 10:53 | 23 | points? |
| 10:53 | 24 | THE COURT: Yes. |
| 10:53 | 25 | MR. VALLE: Because the -- the point of removing |

| | | |
|---|---|---|
| 10:53 | 1 | that first day -- and I think the first two days -- is |
| 10:53 | 2 | because they're atypical.  That's the reason for removing |
| 10:53 | 3 | them. |
| 10:53 | 4 | Those first two days -- a million two and then |
| 10:53 | 5 | 200,000 -- are not replicated.  If you look at the entire |
| 10:53 | 6 | month of July, they didn't have a sale of $200,000.  The |
| 10:53 | 7 | entire month of August -- until the last day when you're |
| 10:53 | 8 | coming into the winter.  I think Your Honor did it exactly |
| 10:54 | 9 | right.  You remove those two anomalous days.  You start on |
| 10:54 | 10 | Monday, and use 13 days.  And then you have to mitigate the |
| 10:54 | 11 | 125,000. |
| 10:54 | 12 | Our alternative proposal was to use the month of |
| 10:54 | 13 | July, which removes the atypicality of what's happening in |
| 10:54 | 14 | the period right after the TRO is lifted.  There, you have a |
| 10:54 | 15 | summer month right after the TRO is lifted, and it seems to |
| 10:54 | 16 | not suffer from any of the failures of the other |
| 10:54 | 17 | methodologies. |
| 10:54 | 18 | THE COURT:  Okay. |
| 10:54 | 19 | MR. LIEBERMAN:  A few seconds on this? |
| 10:54 | 20 | THE COURT:  Hold on. |
| 10:54 | 21 | MR. LIEBERMAN:  If I can have 20 seconds on this? |
| 10:54 | 22 | THE COURT:  All right. Just a moment.  Hold on. |
| 10:54 | 23 | MR. VALLE:  I just want to also object to two new |
| 10:54 | 24 | methodologies being suggested at the oral argument.  That's |
| 10:54 | 25 | not fair. |

| | | |
|---|---|---|
| 10:54 | 1 | THE COURT: Understood. |
| 10:54 | 2 | MR. LIEBERMAN: With respect to the July argument |
| 10:54 | 3 | and arguing these times periods are -- that July is the |
| 10:54 | 4 | appropriate time period, Your Honor held in the tentative, |
| 10:55 | 5 | at page 7, line 10, that during the June time period our |
| 10:55 | 6 | sales and marketing efforts were completely stalled.  That |
| 10:55 | 7 | is why July is lower than any of the other months. |
| 10:55 | 8 | Number two, day two should be counted, Your Honor. |
| 10:55 | 9 | If you look at day four, June 25th, 2008, that was $257,000. |
| 10:55 | 10 | There was nothing anomalous about day two.  What would be |
| 10:55 | 11 | inappropriate is to measure damages by the month immediately |
| 10:55 | 12 | after the TRO were lifted.  We had to get back to where we |
| 10:55 | 13 | were before, Your Honor.  We were hurt by the TRO.  And |
| 10:55 | 14 | that's why the July period is not the appropriate period. |
| 10:55 | 15 | MR. VALLE: Just ten seconds, Your Honor. |
| 10:55 | 16 | Let's assume the TRO had never been issued.  Spear |
| 10:55 | 17 | had voluntarily taken its product off the market for 30 |
| 10:55 | 18 | day's.  It would have been in that position of revamping |
| 10:55 | 19 | exactly what it claims was happening in July.  July is the |
| 10:56 | 20 | perfect month to use, if you follow my logic. |
| 10:56 | 21 | THE COURT: What about that, Mr. Lieberman, the |
| 10:56 | 22 | voluntary aspect? |
| 10:56 | 23 | MR. LIEBERMAN: Your Honor, this was -- this added |
| 10:56 | 24 | another two weeks onto that time period.  When customers are |
| 10:56 | 25 | without product and they turn to Spear and say, "We would |

| | | |
|---|---|---|
| 10:56 | 1 | like more product," when they hear that Spear is in the |
| 10:56 | 2 | market and Spear is not able to supply more product, that |
| 10:56 | 3 | does serious injury to the customer's expectation of |
| 10:56 | 4 | receiving additional product. We could not contact -- |
| 10:56 | 5 | THE COURT: Yeah. But you're not addressing the |
| 10:56 | 6 | voluntary withdrawal issue. |
| 10:56 | 7 | MR. LIEBERMAN: Your Honor, the sales during the |
| 10:56 | 8 | voluntary withdrawal period have been deducted under all of |
| 10:56 | 9 | the different methodologies. |
| 10:56 | 10 | THE COURT: No. But the argument is that you're |
| 10:56 | 11 | saying, "Gee, we had a hard time starting up." Mr. Valle |
| 10:56 | 12 | has just stated you had a hard time starting up, in part, |
| 10:56 | 13 | because of the voluntary action you took. |
| 10:56 | 14 | MR. LIEBERMAN: Yeah, I'm not sure that Mr. Valle |
| 10:57 | 15 | can show what difficulty -- |
| 10:57 | 16 | THE COURT: Who has to show? He or you? |
| 10:57 | 17 | MR. LIEBERMAN: I would say that, given the |
| 10:57 | 18 | standard, Your Honor, with respect to the presumption that |
| 10:57 | 19 | you recover damages when an injunction was wrongfully |
| 10:57 | 20 | issued, it would be his burden with respect to this. We met |
| 10:57 | 21 | our prima facie case. |
| 10:57 | 22 | In any event, Your Honor, this isn't an issue you |
| 10:57 | 23 | have to address because you have picked methodologies. And |
| 10:57 | 24 | our variations, which just have to do with the |
| 10:57 | 25 | calculations -- you are looking at the time period that |

```
10:57   1   begins on either June 20th, we would submit, or June 23rd,
10:57   2   which was in your tentative.  It goes through the end of
10:57   3   June.  It goes through July.  You are focusing yourself on
10:57   4   our weakest time period.  On our weakest time period.  So by
10:57   5   adopting that time period, you've implicitly adopted
10:57   6   Mr. Valle's argument.
10:57   7          Selecting July 1st is just random.  There's no
10:58   8   basis for starting it on July 1st.  Your Honor selected
10:58   9   June 23rd.  We would suggest, under your order where you
10:58  10   found day one anomalous, you should start on June 20th.  We
10:58  11   don't agree with that approach, which is why we suggested
10:58  12   different approaches.  But if Your Honor is using that
10:58  13   approach, you've also essentially adopted Mr. Valle's
10:58  14   argument.
10:58  15          THE COURT:  Anything further, Mr. Valle?
10:58  16          MR. VALLE:  I would only say that the whole point
10:58  17   of using July was to remove the anomalous period right after
10:58  18   the TRO was lifted, when they received huge volumes of sales
10:58  19   that tripled what their July month was.  And it's their
10:58  20   burden to prove, of course, to satisfy damages.
10:58  21          THE COURT:  All right.  Thank you, Counsel.  I'll
10:58  22   take a look at it.
10:58  23          MS. STANDISH:  Thank you, Your Honor.
10:58  24          THE COURT:  Thank you.
10:58  25       (At 10:58 a.m., proceedings were adjourned.)
```

10:58  1                           -oOo-
10:58  2

DEBBIE GALE, U.S. COURT REPORTER

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  December 28, 2009

_____
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR